# EXHIBIT - 2

## APPELLANTS OPENING BRIEF

## DATED NOVEMBER 15TH 2007

### BY ATTORNEY OF RECORD
### MS. JANICE R. MAZUR



COPY

# IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA
## FIRST APPELLATE DISTRICT
## DIVISION FIVE

PEOPLE OF THE STATE OF )  Court of Appeal
CALIFORNIA, ) Case No. A115717
)
    Respondent, )
)
v. )
) Superior Court
SCOTT FELIX, ) Case No. 109100
)
    Appellant. )
)
_____ )

**FILED**

NOV 1 5 2007

Court of Appeal - First App. Dis.

By DIANA HERBERT

DEPUTY

On Appeal from the Superior Court of San Diego
The Honorable Mary Morgan, Judge
The Honorable James J. McBride, Judge

---

## APPELLANT'S OPENING BRIEF

---

Janice R. Mazur, SBN 144611
William E. Mazur, Jr., SBN 166014
MAZUR & MAZUR
13465 Camino Canada, No. 106-103
El Cajon, CA 92021
Ph: (888) 810-5950
Fax: (888) 447-7085

Attorneys for Appellant
Scott Felix

# IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA
## FIRST APPELLATE DISTRICT
## DIVISION FIVE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,　　　　　　) ) ) | Court of Appeal Case No. A115717 |
| 　　Respondent,　　　　　　) ) | |
| v.　　　　　　　　　　　　) ) | Superior Court Case No. 109100 |
| SCOTT FELIX,　　　　　　　) ) | |
| 　　Appellant.　　　　　　　) ) ) ) | |

On Appeal from the Superior Court of San Diego
The Honorable Mary Morgan, Judge
The Honorable James J. McBride, Judge

## APPELLANT'S OPENING BRIEF

Janice R. Mazur, SBN 144611
William E. Mazur, Jr., SBN 166014
MAZUR & MAZUR
13465 Camino Canada, No. 106-103
El Cajon, CA 92021
Ph: (888) 810-5950
Fax: (888) 447-7085

Attorneys for Appellant
Scott Felix

# **TOPICAL INDEX**

STATEMENT OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

OVERVIEW OF THE SEXUALLY VIOLENT PREDATORS'
ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A RESPONDENT IN AN SVP PROCEEDING IS ENTITLED TO
DUE PROCESS PROTECTIONS . . . . . . . . . . . . . . . . . . . . . . . . 17

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.     THE TRIAL COURT LACKED JURISDICTION TO
       EXTEND APPELLANT'S COMMITMENT AFTER
       SEPTEMBER 20, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       A.    SB 1128 repealed the re-commitment provisions of the
            former law and the courts are thus without statutory
            authority to apply the new law to persons already
            committed under the old law . . . . . . . . . . . . . . . . . . . 18

       B.    The courts are without authority to re-write the amended
            statute to comport with the Legislative intent . . . . . . 22

II.    THE PEOPLE ARE JUDICIALLY ESTOPPED FROM
       PROCEEDING ON THE PETITIONS BY VIRTUE OF
       THEIR ENTRY INTO A CONSENT JUDGMENT
       PRECLUDING THE TYPES OF DIAGNOSIS RENDERED
       IN THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.  THE PETITIONS SHOULD HAVE BEEN DISMISSED
      BECAUSE THE PEOPLE FAILED TO ALLEGE OR PROVE
      A "RECENT OVERT ACT" ......................... 37

      A.   Principles of statutory construction compel a finding that
           a recent overt act is necessary when the SVP candidate
           has been out of custody for an extended period of
           time ...................................... 40

      B.   Due process requires a finding that the defendant must
           have committed a 'recent overt act' if the petition is
           initiated after he has been out of custody following his
           last sexual violation ......................... 41

IV.   THE PETITIONS MUST BE DISMISSED BECAUSE THEY
      WERE NOT SUPPORTED BY THE EVALUATIONS OF
      TWO, INDEPENDENT PSYCHOLOGISTS OR
      PSYCHIATRISTS AS REQUIRED BY SECTION 6601 .. 46

V.    RETROACTIVE APPLICATION OF THE AMENDED
      STATUTES TO THE 2002/2004 PETITIONS VIOLATES
      APPELLANT'S DUE PROCESS RIGHTS ............. 49

VI.   ASSUMING, ARGUENDO, THAT THE INDETERMINATE
      COMMITMENT IS VALID, THE TRIAL COURT ERRED
      INDISMISSING THE 2006 PETITION ................ 56

CONCLUSION ......................................... 58

CERTIFICATE OF WORD COUNT ....................... 58

ii

# **TABLE OF AUTHORITIES**

<u>**California Cases**</u>

<u>Butler v. Superior Court</u>
(2000) 78 Cal.App.4th 1171 . . . . . . . . . . . . . . . . . . . . . . . . . . 57

<u>Evangelatos v. Superior Court</u>
(1988) 44 Cal.3d 1188 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

<u>Fontana Unified School District v. Burman</u>
(1988) 45 Cal.3d 208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

<u>Great Lakes Properties, Inc. v. City of El Segundo</u>
(1977) 19 Cal.3d 152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Halbert's Lumber, Inc. v. Lucky Stores, Inc.</u>
(1992) 6 Cal.App.4th 1233 . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Hubbart v. Superior Court</u>
(1999) 19 Cal.4th 1138 . . . . . . . . . . . . . . . . . . . . 15, 16, 19, 52

<u>In re Luke W.</u>
(2001) 88 Cal.App.4th 650 . . . . . . . . . . . . . . . . . . . . . . . . . . 40

<u>Jackson v. County of Los Angeles</u>
(1997) 60 Cal.App.4th 171 . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Jurcoane v. Superior Court</u>
(2001) 93 Cal. App. 4th 886 . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>In re Malinda S.</u>
(1990) 51 Cal.3d 368 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

McClung v. Employment Development Dept.
　　(2004) 34 Cal.4th 467 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52

People v. Avena
　　(1996) 13 Cal.4th 394 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

People v. Campbell
　　(1902) 138 Cal. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

People v. Carlin
　　(2007) 150 Cal.App.2d 322 . . . . . . . . . . . . . . . . . . . . . . . . . .   54

People v. Garcia
　　(1999) 21 Cal.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23, 26, 27

People v. Guzman
　　(2005) 35 Cal.4th 577 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23, 26

People v. Henderson
　　(1986) 187 Cal.App.3d 1263 . . . . . . . . . . . . . . . . . . . . . . . . . .   1

People v. Hurtado
　　(2002) 28 Cal.4th 1179 . . . . . . . . . . . . . . . . . . . . . . . . .   17, 52, 54

People v. Martin
　　(1980) 107 Cal.App.3d 714 . . . . . . . . . . . . . . . .   37, 38, 40, 42

People v. Munoz
　　(2005) 129 Cal.App.4th 421 . . . . . . . . . . . . . . . . . . . . . . . . . .   57

People v. Otto
　　(2001) 26 Cal.4th 200 . . . . . . . . . . . . . . . . . . . . . . . . .   17, 52, 54

People v. Pieters
　　(1991) 52 Cal.3d 894 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

People v. Robles
        (2000) 23 Cal.4th 1106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

People v. Shields
        (2007) 155 Cal.App.4th 559 . . . . . . . . . . . . . . . . 22, 23, 24, 27

Ross v. City of Long Beach
        (1944) 24 Cal.2d 258 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Security Pacific National Bank v. Wozab
        (1990) 51 Cal.3d 991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

## California Statutes

Code of Civil Procedure
        section 170.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        section 904.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        section 1858 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Penal Code
        section 1237 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Welfare & Institutions Code
        section 6600 . . . . . . . . . . . . . . . . . . . . 1, 9, 14, 15, 16, 18, 38, 40

        section 6601 . . . . . . . . . . . . . . . . . . . . . . . . 15, 21, 22, 37, 46, 48

        section 6601.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        section 6603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        section 6604 . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 19, 20, 49, 50

section 6604.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19, 21, 49, 50

section 6605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20, 21

## **Federal Cases**

<u>Chapman v. California</u>
    (1967) 386 U.S. 18, [87 S.Ct. 824, 17 L.Ed.2d 705] . . . . . . 17

<u>Cleveland v. Policy Management Systems Corp.</u>
    (5th cir. 1997) 120 F.3d 513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Davis v. Wakelee</u>
    (1895) 156 U.S. 680, 15 S.Ct. 555 . . . . . . . . . . . . . . . . . . . . . 29

<u>Edwards v. Aetna Life Ins. Co.</u>
    (6th cir., 1982) 690 F.2d 595 . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Foucha v. Louisiana</u>
    (1992) 504 U.S. 71,[112 S.Ct. 1780, 118 L.Ed.2d 437] . . . . 17

<u>Kansas v. Crane</u>
    (2002) 534 U.S. 407, 122 S.Ct. 867 . . . . . . . . . . . . . . . . . . . 45

<u>Landgraf v. USI Film Products</u>
    (1994) 511 U.S. 244, [128 L.Ed.2d 229, 114 S.Ct. 1483] . . 51

<u>Lynch v. Baxley</u>
    (M.D. Ala. 1974) 386 F.Supp. 378 . . . . . . . . . . . . . . . . . . . . . 45

<u>Marbury v. Madison</u>
    (1803) 5 U.S. (1 Cranch) 137, [2 L.Ed. 60, 73]. . . . . . . . . . 25

<u>Morrissey v. Brewer</u>
    (1972) 408 U.S. 471, [92 S.Ct. 2593, 33 L.Ed.2d 484] . . . . 52

New Hampshire v. Maine
    (2001) 532 U.S. 742, 121 S.Ct. 1808 . . . . . . . . . . . . . . .  29, 35

Russell v. Rolfs
    (9th cir. 1990) 893 F.2d 1033 . . . . . . . . . . . . . . . . . . . . . . . . .  30

United States v. McCaskey
    (5th Cir. 1993) 9 F.3d 368 . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

United States v. Monsanto
    (1989) 491 U.S. 600, 109 S.Ct. 2657 . . . . . . . . . . . . . . . . . .  41

United States v. Naftalin
    (1979) 441 U.S. 768, 99 S.Ct. 2077 . . . . . . . . . . . . . . . . . . .  41

United States v. Security Industrial Bank
    (1982) 459 U.S. 70, [74 L.Ed.2d 235, 103 S.Ct. 407] . . . . .  51

**Other State Cases**

In re Gonzalez
    (Iowa Sup. Ct. 2003) 658 N.W.2d 102 . . . . . . . . . . .  43, 44, 45

In re Harris
    (1982) 98 Wn.2d 276, 654 P.2d 109 . . . . . . . . . . . . . . . . . .  42

In re Young
    (Wash., 1993) 122 Wn.2d 1, 857 P.2d 989 . . . . . . . . . . .  42, 43

## Secondary Sources

7 Witkin Sum. Cal. Law, Const Law § 633  . . . . . . . . . . . . . . . . . .  51

*The Judiciary Says, You Can't Have It Both Ways: Judicial Estoppel-
A Doctrine Precluding Inconsistent Positions*
      (1996) 30 Loyola L.A.L.Rev. 323  . . . . . . . . . . . . . . . . . . . . .  30

## STATEMENT OF APPEALABILITY

This appeal is from a final judgment of a Sexually Violent Predator ("SVP") commitment to the Department of Mental Health ("DMH") after trial. This appeal is also taken from an order dismissing a subsequent SVP petition over objection by the defense. Both the Judgment and the dismissal are appealable pursuant to Code of Civil Procedure section 904.1 as a final judgment and pursuant to Penal Code section 1237, subdivision (b) as an order made after judgment of conviction. (People v. Henderson (1986) 187 Cal.App.3d 1263, 1266-1267.)

## INTRODUCTION

This is an appeal from a indeterminate term commitment under Welfare & Institutions Code section 6600, et seq.

In 1982, at the age of 21, appellant committed a series of sex crimes over a nine-day period. He pled guilty to several charges and was convicted in 1982. After serving years in prison, he was paroled in 1993 and released into the community where he remained, sex-crime free, for more than two years. In 1996 he was arrested on a misdemeanor drunk-in-public charge which resulted in a revocation of his parole. Although no new sex crime had been committed, the

state initiated a Petition for Commitment under the Sexually Violent

Predators Act ("SVPA"). The 1996 Petition was found true and the

defendant was committed to the Department of Mental Health for a

two-year term. Over the next few years, several Petitions to extend

the commitment were filed. As of late 2006, Petitions to extend his

commitment which had been filed in 2002, 2004 and 2006 had

"stacked up" and appellant remained in Atascadero State Hospital

although there had been no valid judgment that he was an SVP for at

least six years. Finally, in October 2006, he was tried on two-year

commitment extension Petitions filed in 2002, 2004 and 2006.

Meanwhile, the Legislature amended the SVPA to provide for

indeterminate terms of confinement. The result is that this appellant,

who has not committed a sex crime for 25 years, despite having

completed his sentence for his crimes in 1993, and despite having

been free in the community for almost two years with no new sex

offenses, has been confined for the past eleven years and is now

confined for an indeterminate term.

The proceedings and the confinement violate the spirit and the

letter of the statutory scheme and are unconstitutional on many levels.

2

For the reasons set forth below, the appellant is entitled to immediate release.

## STATEMENT OF THE CASE[1]

### Procedural History

In 1982, when he was 21 years old, the appellant, Scott Felix, pled guilty to several sexual offenses. (CT 5E, RT 10/10, p. 204, RT 10/11, pp. 319-320). After serving eleven years in prison, he was paroled in December 1993. (RT 10/13, p. 323). After his release, he was out of custody on parole for periods totaling approximately 20 months. (CT 18-19). During that time, he did not commit any sexual offenses. (RT 10/10, p. 206, CT 18-20).[2] For most of that period, he

---

[1]

"CT" refers to the two-volume Clerk's Transcript, including pages 1-124, which is the sealed Petition for Extended Commitment (and attachments thereto), filed by the People on July 11, 2006. "RT" refers to the multi-volume Reporter's Transcripts, which will be identified by date. "RJN" refers to appellant's Request for Judicial Notice filed concurrently with this brief. All statutory references are to the Welfare & Institutions Code unless otherwise stated.

[2]

During this time period, the respondent was arrested for an assault and possession of stolen property, but the charges were dismissed for lack of evidence. (RT 10/11, p. 323-324.) Thereafter, his parole was revoked based on an alleged stalking complaint by a female parole officer who knew his past history and was frightened when she fortuitously ran into him several times. Although his parole

3

was subject to frequent testing for drug and alcohol use, with no violations. (RT 10/10, p. 223.)  However, in March of 1996, the appellant was arrested on a misdemeanor drunk in public charge and his parole was revoked for violation of an alcohol-abstention condition. (RT 10/6, p. 79, RT 10/11, p. 343.)

Upon completion of the respondent's parole revocation term following the drunk in public charge, the People initiated involuntary commitment proceedings pursuant to Welfare & Institutions Code section 6604.  At the time, the law provided for extended commitments of two years. (CT 1-4.)

Between 1996 and 2002, the respondent had several trials, at least one of which resulted in a finding that he was an SVP and he was committed to the custody of the DMH.[3] (RT 7/17/06, p. 3.)

---

was initially revoked based on the allegation, after investigation, the allegation was dismissed as unsubstantiated.  He was not returned to custody as a result. (RT 10/6, pp. 78-79, 10/11, pp. 325-340.)

[3]

The current appellate record is not entirely clear as to the details of the proceedings between 1996 and 2002.  It appears that the initial 1996 commitment petition was found to be true.  Thereafter, petitions to continue the commitment were apparently filed every two years.  At one point the appellant was found to be an SVP in a combined proceeding under §§ 6604 and 6605 (a motion for early release), but that verdict was set aside by stipulation of the parties.

4

In 2002 the People filed a Petition for Extended Commitment for the time period of July 23, 2002 through July 22, 2004. ("the 2002 Petition"). In 2004, although the 2002 petition had not yet been tried, the People filed another Petition for Extended Commitment for the time period July 23, 2004 through July 22, 2006. ("the 2004 Petition") (RT 7/17, p. 16.) The 2002 and 2004 Petitions were apparently consolidated in September 2004. (CT 309.) On July 11, 2006, although neither the 2002 nor the 2004 petition had been tried, the People filed another Petition for Extended Commitment for the time period July 23, 2006 through July 22, 2008. ("the 2006 Petition") (CT 1-124.)[4]

Finally, in 2006, after the appellant had spent ten years in the custody of the DMH, all three pending Petitions (2002, 2004 and 2006), were set for trial. The 2002 and 2004 Petitions were assigned to the Honorable Mary Morgan. The 2006 Petition was to trail the

_____

(RT 9/15, p. 14, RT 9/19/06, p.4-5, RT 9/29/06, p. 10.) In any event, it is undisputed that the appellant has remained confined in the custody since 1996. (CT 256, RT 10/11, p. 344.)

[4]

The sealed 2002 and 2004 Petitions have not been included in the appellate record. However, the parties agree that all three petitions are virtually identical (RT 10/3, pp. 13-14, CT 307.)

first trial, and was assigned to the Honorable James J. McBride. (RT

9/29, p. 13, RT 10/20, pp. 687-688.)[5]

On August 1st and August 8, 2006, appellant's counsel, Donald

Bergerson, filed two motions to dismiss the petitions, one on the basis

of judicial estoppel (CT 134-233) and the other on basis that the

People had not alleged a required element necessary for SVP status.

(CT 234-247.)  The People filed oppositions to the motions on

August 30, 2006. (CT 255-263, 264-274.)  Appellant filed replies to

the People's oppositions on September 5, 2006. (CT 275-300, CT

301-306.)  Both motions were denied on September 11, 2006. (CT

316, RT 9/11, pp. 9.)

Just prior to trial, on September 15, 2006, attorney Bergerson

was relieved and new counsel, Ken Quigley, was appointed on all

three Petitions. (CT 317.)


Meanwhile, on September 20, 2006, the California Legislature

---

[5]

The 2006 Petition was apparently assigned to a different judge
because the respondent filed a Code of Civil Procedure section 170.6.
challenge to Judge Morgan as to the 2006 petition. (CT 131, RT 10/3,
p. 13.)

6

passed urgency legislation known as Senate Bill 1128 which amended

Penal Code sections 6604 and 6604.1 and several other provisions of

the SVPA.  The amended statutes provide for commitment for an

indeterminate term, rather than a two-year term, upon a finding that

the respondent is a sexually violent predator.

Just after the effective date of SB 1128, on September 27,

2006, the People moved to amend all three pending Petitions to assert

an indeterminate term of commitment rather than a two-year term of

commitment. (CT 321-332)[6]  Judge Morgan granted the motion to

amend with the proviso that it was, at that point in time, unclear

whether the amendment of the statute would apply to the Petitions

which had been pending prior to the effective date of the amendment.

She indicated that if the Petitions were found true, the question of the

term of commitment could be litigated later.  (RT 10/3, pp. 15-16.)

The 2002 and 2004 Petitions came on for trial before Judge

---

[6]

Although the written motion was directed to Judge McBride,
Judge Morgan addressed the motion with respect to the 2002 and
2004 Petitions. (RT 10/3, p. 13.)  It appears that Judge McBride never
did make a ruling with respect to the 2006 Petition because it was
ultimately dismissed. (RT 10/23, p. 5, CT 410.)

7

Morgan in October 2006. On October 18, 2006, the jury returned a
true finding on the allegations. (CT 404, 406, RT 10/18, pp. 673-675.)

The commitment hearing was held on October 20, 2006. At
that hearing the People argued that the indeterminate commitment
provision of the new law applied to the 2002 and 2004 Petitions. The
defense argued that an indeterminate commitment would constitute a
violation of the due process and ex post facto clauses of the federal
Constitution. The court agreed with the People and ordered
appellant committed to the DMH for an indeterminate term. (RT
10/20, pp. 682-686.)

On October 23, 2006, on motion by the People, and over
defense objection, Judge McBride dismissed the 2006 Petition in light
of the indeterminate term imposed on the 2002 and 2004 Petitions.
(RT 10/23, pp. 2-5.)

On October 26, 2006, appellant timely filed a Notice of Appeal
from both the Judgment on the 2002-2004 Petitions, and as to the
dismissal of the 2006 Petition. (CT 411-412.)

8

**Statement of Facts**[7]

Trial commenced on the 2002/2004 Petitions before Judge

Morgan on October 6, 2006. (CT 363-364.)

**Dr. Mark Scherrer**, called by the People, is a clinical

psychologist at Atascadero State Hospital ("ASH") who specializes in

forensic psychology. (RT 10/6, p. 17.) In assessing an SVP-

candidate, his job is to determine whether that person meets the

criteria required under Welfare & Institutions Code sections 6600, et.

seq. Specifically, he is asked to determine whether the person suffers

from a mental disorder that predisposes him to the commission of

sexual crimes, whether it's congenital or acquired, whether it causes

emotional and/or volitional impairment and consequently, whether or

not they are likely to commit those crimes in the future. He also tries

to determine whether the nature of the crimes is predatory within the

meaning of the law. (RT 10/6, pp. 39-40.)

In order to complete his assessment, Dr. Scherrer reviews the

---

[7]

Since all of the issues presented in this appeal are legal issues,
the Statement of Facts does not purport to summarize all of the
evidence presented. Rather, it summarized only the evidence
necessary to evaluate the issues raised.

patient's medical charts, social history documents, prior evaluations, criminal history documents, including probation reports,, etc., prior to conducting a clinical interview with the subject. (RT 10/6, pp. 33-39.)

Dr. Scherrer's first evaluation of Scott Felix resulted in report dated March 17, 2000. (RT 10/6, pp. 40-41.)  In that report, Dr. Scherrer's primary diagnosis of Mr. Felix was "paraphilia not otherwise specified" ("paraphilia NOS"). (RT 10/6, p. 42.)

Paraphilia is broad category of mental disorder characterized by sexual deviancies.  Paraphilia is defined in the Diagnostic and Statistic Manual of Mental Disorders ("the DSM IV") as recurrent, intense, sexual arousing fantasies, urges or behaviors that occur over a period of at least six months that cause distress or impairment in social, occupational or other important areas of life. (RT 10/6, pp. 44.)

Paraphilia has many sub-categories such as fetishism (attraction to inanimate objects), pedophilia (attraction to children), frotteurism (sexual excitement from rubbing against other people), and so forth. (RT 10/6, 43.)

10

For all major categories, the DSM IV includes a "not otherwise specified" ("NOS") sub-category for mental disorders which are not specifically listed or described. (RT 10/6, pp. 43-44.)

Dr. Scherrer's March 2000 report described Mr. Felix's condition as "paraphilia NOS" which he noted was, in this case, sexual activity with non-consenting adults with force and against resistance which began in adolescence. (RT 10/6, p. 42.)

His 2000 report also diagnosed alcohol dependence in a controlled environment and polysubstance dependence in a controlled environment. He also noted a personality disorder, NOS, with strong anti-social features. (RT 10/6, 46.)

Subsequent to his initial March 2000 report, Dr. Scherrer did further evaluations of Mr. Felix in April 2002, (RT 10/6, p. 47, CT 66-95), July 16, 2004 (RT 10.6, p 48, CT 96-104), June 28, 2005 (RT 10/6, p. 48, CT 105-116), and March 21, 2006. (RT 10/6, p. 48, CT 117-124.)  His primary diagnoses in all of these reports has been consistent since 2000: paraphilia, not otherwise specified. (RT 10/6, pp. 49-50.)

11

Based on his evaluations, Dr. Scherrer opined that Mr. Felix has a diagnosed mental disorder that makes him a danger to the health and safety of others and that it is likely that he will engage in sexually violent predatory criminal behavior in the future. (RT 10/10, p. 191.)

**Dr. Dale Arnold** was called by the People.  Dr. Arnold is a consulting psychologist in private practice who consults with attorneys regarding sexual offender treatment and evaluation. (RT 10/16, p. 500.)  He has prepared evaluations of Scott Felix in May of 1999, April of 2001 and October 9, 2006. (RT 10/16, pp. 505-506.) His diagnoses in 1999 were paraphilia NOS, poly-substance dependence, alcohol dependence and personality disorder NOS. (RT 10/16, pp. 509-510.)

Dr. Arnold's diagnosis has not changed since his 1999 evaluation. (RT 10/16, p. 513.)

His paraphilia NOS diagnosis is based primarily on Mr. Felix's criminal history. (RT 10/16, p. 517.)

Dr. Arnold concluded that Mr. Felix is likely to reoffend in a sexually violent manner. (RT 10/16, p. 558.)

12

**Dr. Jack Vognsen** was called by the defense.[8] Dr. Vognsen is a psychologist in private practice. He has testified in court as an expert in evaluating risk for possible SVP cases approximately 300 times, almost always for the prosecution. (RT 10/13, pp. 408-411.)

Dr. Vognsen testified that any assessment of risk in an SVP proceeding has to be adjusted to the individual. One of the most important adjustments for sex offenders is age, as the rate of recidivism sharply declines as they age. The recidivism rate for sex offenders is essentially zero at the age of 60. (RT 10/13, pp. 413-417.) Dr. Scherrer's report did not seem to adjust for the defendant's age (45 at the time of trial). (RT 10/13, p. 413.)

Other factors that are important to consider include periods of time in which the patient is out in the community without committing new sex offenses. Research indicates that for every two year interval during which an offender is out in the community without reoffending, his risk of reoffending drops by about 10%. (RT 10/13, p. 422.)

---

[8]

Dr. Vognsen testified out of order to accommodate a scheduling problem.

## **OVERVIEW OF THE SEXUALLY**

## **VIOLENT PREDATORS' ACT**

The Sexually Violent Predators' Act ("SVPA") is codified at

Welfare & Institutions Code sections 6600, et seq. The requirements

for classification as an SVP are set forth in section 6600, subdivision

(a) and related provisions. First, an SVP must suffer from "a

diagnosed mental disorder that makes the person a danger to the

health and safety of others in that it is likely that he or she will engage

in sexually violent criminal behavior." (§6600, subd. (a).) An SVP

must also have been "convicted of a sexually violent offense against

two or more victims." (Id.) A "sexually violent offense" refers to

certain enumerated sex crimes "committed by force, violence, duress,

menace, or fear of immediate and unlawful bodily injury on the

victim or another person." (§6600, subd. (b).) While there is no

restriction placed on the time at which a prior qualifying crime must

have occurred,

14

> ... prior crimes play a limited role in the SVP
> determination. . . . [J]urors shall be admonished
> that they may not find a person a sexually violent
> predator based on the prior offenses absent
> relevant evidence of a currently diagnosed mental
> disorder that makes the person a danger to the
> health and safety of others in that it is likely that
> he or she will engage in sexually violent criminal
> behavior." (§6600, sub. (a); Hubbart v. Superior
> Court (1999) 19 Cal.4th 1138, 1145.)

An SVP action commences with a screening process, generally

instituted by the Department of Corrections, as to inmates in custody

who are "serving a determinate prison sentence or whose parole has

been revoked" at least six months before their scheduled release dates

from prison. (§6601, subd. (a).) If the screening process indicates the

inmate may be an SVP, he is referred to the DMH for a "ful

evaluation." He must be evaluated by at least two practicing

psychiatrists or psychologists in accordance with a standardized

assessment protocol. (§6601, subds. (c)( and (d).) If two evaluators

agree the inmate is mentally disordered and dangerous within the

meaning of section 6600, the DMH may request a petition for

commitment. If the county counsel concurs, a Petition is filed in the

Superior Court. (§6601, subds. (b), (c), (d), (h) & (i).)

15

Once a Petition for Commitment is filed, the inmate is entitled to a "probable cause" hearing by the court. If the court finds probable cause to believe that the person is likely to engage in sexually violent predatory criminal behavior upon release, he must remain in a "secure facility" until such time as his trial is complete. (§6600; Hubbart, supra, 19 Cal.4th at 1146-1147.)

The trier of fact must determine, unanimously and beyond a reasonable doubt, that the defendant is an SVP within the meaning of the statute. If a true finding is made, the defendant is committed to the DMH for appropriate treatment and confinement. (§6604.)

Prior to September 2006, the commitment period was for two years, and the People had a right to file a Petition for Extended Commitment for additional two year periods prior to expiration of the two year term. (Hubbart v. Superior Court (1999) 19 Cal.4th 1138, 1147.) As is discussed more fully below, in September 2006, the SVPA was amended to provide for an indeterminate commitment term, rather than a two-year term.

16

## A RESPONDENT IN AN SVP PROCEEDING

## IS ENTITLED TO DUE PROCESS PROTECTIONS

> Although the SVPA is a civil proceeding, its procedures have many of the trappings of a criminal proceeding"; "[a]n SVPA commitment unquestionably involves a deprivation of liberty, and a lasting stigma,...."([People v. Hurtado (2002) 28 Cal.4th 1179] at pp. 1192, 1194; see also People v. Otto (2001) 26 Cal.4th 200, 209.)

The United States Supreme Court agrees:

> . . . [b]ecause civil commitment involves a significant deprivation of liberty, *a defendant in an SVP proceeding is entitled to due process protections*. (Foucha v. Louisiana (1992) 504 U.S. 71, 80 [112 S.Ct. 1780, 1785-1786, 118 L.Ed.2d 437]. [emph. added].)

The test set forth in Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 governs review of constitutional error in SVPA cases: Federal constitutional error is reversible unless shown to be harmless beyond a reasonable doubt. (Hurtado, supra, 28 Cal.4th at p. 1194.

17

# LEGAL ARGUMENT

## I.

## THE TRIAL COURT LACKED JURISDICTION TO

## EXTEND APPELLANT'S COMMITMENT

## AFTER SEPTEMBER 20, 2006

**A.**   **SB 1128 repealed the re-commitment provisions of the former law and the courts are thus without statutory authority to apply the new law to persons already committed under the old law**

On September 20, 2006, Senate Bill 1128 (SB 1128), the "Sex

Offender Punishment, Control, and Containment Act of 2006", was

signed by the Governor and chaptered by the Secretary of State.  It

became immediately effective as urgency legislation.  Five of its

sixty-two sections amended various sections of the Sexually Violent

Predator Act (SVPA or the Act), codified as Welfare and Institutions

Code section 6600, et seq.  The primary effect of the amendments to

the SVPA was to change the term of commitments under the Act from

a two-year term to an indeterminate term.  However, the amendments

also deleted the only statutory language that authorized extended

commitments of persons, like the appellant, who had been previously

18

committed under the SVPA for a two-year term and whose term had

thereafter expired prior to the enactment of SB 1128.

This case presents a novel issue of statutory interpretation

which calls upon the court to decide how to implement a statutory

revision, the language of which clearly and unambiguously

accomplished exactly the opposite of that which the Legislature may

have intended.

From its inception in 1996 until amendment by SB 1128 over

ten years later, the SVPA provided for two-year commitments which

could be extended every two years upon the filing of a new petition

and an extended commitment being obtained from the court. (§ 6604;

Hubbart v. Superior Court , supra, 19 Cal.4th at 1147.)

The *only* language in the Act authorizing extended commitment

proceedings was contained in section 6604 and referenced by section

6604.1, both of which were amended by SB 1128.  Both sections are

reproduced here with strike-out type showing the language deleted by

SB 1128 and underscored type showing language added by SB 1128.

19

Section 6604
The court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator. If the court or jury is not satisfied beyond a reasonable doubt that the person is a sexually violent predator, the court shall direct that the person be released at the conclusion of the term for which he or she was initially sentenced, or that the person be unconditionally released at the end of parole, whichever is applicable. If the court or jury determines that the person is a sexually violent predator, the person shall be committed for ~~two years~~ an indeterminate term to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health, ~~and the person shall not be kept in actual custody longer than two years unless a subsequent extended commitment is obtained from the court incident to the filing of a petition for extended commitment under this article or unless the term of commitment changes pursuant to subdivision (e) of Section 6605~~. Time spent on conditional release shall not count toward the term of commitment, unless the person is placed in a locked facility by the conditional release program, in which case the time in a locked facility shall count toward the term of commitment. The facility shall be located on the grounds of an institution under the jurisdiction of the Department of Corrections and Rehabilitation.

20

Section 6604.1

(a) The ~~two year~~ <u>indeterminate</u> term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section. ~~The initial two-year term shall not be reduced by any time spent in a secure facility prior to the order of commitment. For any subsequent extended commitments, the term of commitment shall be for two years commencing from the date of the termination of the previous commitment.~~

(b) The person shall be evaluated by two practicing psychologists or psychiatrists, or by one practicing psychologist and one practicing psychiatrist, designated by the State Department of Mental Health. The provisions of subdivisions (c) to (i), inclusive, of Section 6601 shall apply to evaluations performed ~~for purposes of extended commitments~~ <u>pursuant to a trial conducted pursuant to subdivision (f) of Section 6605</u>. The rights, requirements, and procedures set forth in Section 6603 shall apply to ~~extended~~ <u>all</u> commitment proceedings.

As can be seen, the language of both statutes was amended to delete all reference to extended commitment proceedings. And the amendments contain no savings clause pertaining to individuals like appellant, who were previously committed under the Act and whose

commitments had expired prior to the enactment of SB 1128. The

only provision for commitment under the newly amended SVPA

requires that the person to be committed be "in custody [of the

Department of Corrections and Rehabilitation] pursuant to [a]

determinate prison term, parole revocation term, or a hold placed

pursuant to Section 6601.3, at the time the petition is filed." (§ 6601,

subd. (a)(2).) In other words, the only type of commitment which

exists as of September 20, 2006 is an initial commitment.

**B.      The courts are without authority to re-write the amended statute to comport with the Legislative intent**

This argument, to wit, that the amendment to the SVPA

effectively repealed any provision for extended commitments of

persons already confined, was recently considered and rejected by the

Fourth Appellate District, Division One in People v. Shields (2007)

155 Cal.App.4th 559. In Shields, the court did not dispute that the

relevant language had been omitted from the amended version of the

statute, but found, nevertheless, that the "obvious intent" of the

Legislature was to "enhance–not restrict" confinement of persons

found to be SVP's. Based on this analysis, the Shields court held that

22

"language of a statute should not be given a literal meaning if doing so would result in absurd consequence which the Legislature did not intend" (citing People v. Pieters (1991) 52 Cal.3d 894, 898-899) and that therefore, the provisions of amended section 6604 apply to those persons confined for two-year terms under the former version of the statute. Respectfully, the Shields court has engaged in an unconstitutional re-writing of the statute.

The separation of powers doctrine (Cal. Const., art. III, § 3), as interpreted by the Supreme Court, has previously limited courts to relatively minor rewriting of statutes to correct drafters' error and, even then, only when it has been obvious that *a word* or *a number* had been erroneously used or omitted. (People v. Guzman (2005) 35 Cal.4th 577, 587; quoting People v. Garcia (1999) 21 Cal.4th 1, 14.) In Shields, however, both the Superior Court and the Court of Appeal added back into the SVPA an entire jurisdictional provision which the Legislature had just removed. This was an unprecedented expansion of the use of "that drastic tool of construction" (Id.), one which transgressed the boundaries between the legislative and judicial functions.

The Act as amended by SB 1128 is a perfectly unambiguous and functional act, but one that fails to acknowledge the existence of those persons then under two-year commitments or to make any provision for their extended commitment upon the expiration of their two-year commitments. If ever there was statutory "drafters' error," the removal of the jurisdictional authorization to extend the commitments of those then under two-year commitments is it. It is a monumental error and unarguably did not implement the full intent of the Legislature, which includes keeping those committed under the Act confined until they no longer pose a serious risk to reoffend as a result of their diagnosed mental disorder.

Relying on the clear intent of the Legislature to strengthen and improve the laws that punish and control sexual offenders, the <u>Shields</u> court held this situation was controlled by two well-established principles: First, that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend; and second, that statutory provisions may be added by implication when compelled by necessity and supported by firm evidence of the drafters' true intent. (<u>Shields,</u>

24

<u>supra</u>, 155 Cal.App.4th at p. 564.)

The Court of Appeal's resolution certainly furthered the

Legislature's intent in amending the Act. However, that resolution *by*

*a court* sacrificed the systemic integrity provided by the constitutional

separation of governmental powers in order to accomplish the

immediate goal of continuing to keep several hundred supposedly

dangerous individuals segregated from society. The danger from any

of the three branches of government overreaching the bounds of their

constitutional authority far outweighs the danger posed by a few

hundred individuals. This is especially true where the appropriate

branch of government, the Legislature, has the power to correct its

own mistakes.

> To what purpose are powers limited, and to
> what purpose is that limitation committed to
> writing, if these limits may, at any time, be
> passed by those intended to be restrained?
> The distinction, between a government with
> limited and unlimited powers, is abolished,
> if those limits do not confine the persons on
> whom they are imposed, and if acts
> prohibited and acts allowed, are of equal
> obligation. (<u>Marbury v. Madison</u> *(*1803) 5
> U.S. (1 Cranch) 137, 176-177 [2 L.Ed. 60,
> 73].)

The Supreme Court has established the bounds imposed on

California courts by the separation of powers doctrine in correcting

"drafters' error" contained in legislation.

> It is true, of course, that we occasionally
> have used the concept of drafters' error in
> applying statutes. However, we "do[] not
> lightly assume drafting error ... ." (People
> v. Robles (2000) 23 Cal.4th 1106, 1114 . . .)
> "Consistent with the separation of powers
> doctrine (Cal. Const., art. III, § 3), we have
> previously limited ourselves to relatively
> minor rewriting of statutes and, even then,
> only resorted to that drastic tool of
> construction when it has been obvious that a
> word or number had been erroneously used
> or omitted. [Citations.]" (People v. Garcia
> (1999) 21 Cal.4th 1, 14 . . . [Footnote.]
> Although we may partially rewrite a statute
> "when compelled by necessity and
> supported by firm evidence of the drafters'
> true intent [citation], we should not do so
> when the statute is reasonably susceptible to
> an interpretation that harmonizes all its parts
> without disregarding or altering any of
> them." (Id., at p. 6.) We follow this
> restrained approach to conform to the
> "necessary limitations on our proper role in
> statutory interpretation." (Id., at p. 14.)

(Guzman, supra, 35 Cal.4th at p. 587.)

The language of the SVPA as amended by SB 1128 is clear and

unambiguous. It is a perfectly functional act as amended. Its

language, therefore, controls application of the statute, and there is

nothing to "interpret" or "construe." (Halbert's Lumber, Inc. v. Lucky

Stores, Inc. (1992) 6 Cal.App.4th 1233, 1238-1239.)  It is presumed

the Legislature intended everything in a statutory scheme, and courts

should not read statutes to omit expressed language or to include

omitted language. (Jurcoane v. Superior Court (2001) 93 Cal. App.

4th 886, 894.)  In Garcia, supra, 21 Cal.4th 1, the Supreme Court

noted that no case could be found "in which this court has cured an

asserted drafting error by grafting an entire substantive clause onto a

statute." (Id. at p. 14.)  Yet that is exactly what the Shields court did.

More troublesome yet, the clauses the court grafted back onto the

statutes were the very ones the Legislature had just excised.  "Courts

have no power to rewrite a statute by inserting what the Legislature

has omitted.  'It is axiomatic that in the interpretation of a statute

where the language is clear, its plain meaning should be followed.'

(Great Lakes Properties, Inc. v. City of El Segundo [(1977)] 19

Cal.3d 152, 155.)" (Security Pacific National Bank v. Wozab (1990)

51 Cal.3d 991, 998.)  For a court to insert into a statute language

specifically removed by the Legislature violates the cardinal rule of

27

statutory construction that courts must not add provisions to statutes. (Ibid.; People v. Campbell (1902) 138 Cal. 11, 15; Ross v. City of Long Beach (1944) 24 Cal.2d 258, 260.) "This rule has been codified in California as [Code of Civil Procedure] section 1858, which provides that a court must not 'insert what has been omitted' from a statute." (Security Pacific National Bank v. Wozab, supra, 51 Cal.3d at p. 998.) Accordingly, this court should disregard the Shield's rationale and hold that SB 1128 repealed the statutory authorization in the former SVPA to extend the commitments of persons committed for two years under the earlier statute and that absent any statutory authorization for permitting extended commitment hearings for individuals like appellant, who had been previously committed under the Act, but whose commitments had expired prior to the passage of SB 1128, the superior court was without jurisdiction to conduct an extended commitment proceeding or to issue an extended commitment order.

## II.

## THE PEOPLE ARE JUDICIALLY ESTOPPED FROM

## PROCEEDING ON THE PETITIONS

## BY VIRTUE OF THEIR ENTRY INTO

## A CONSENT JUDGMENT PRECLUDING

## THE TYPES OF DIAGNOSIS RENDERED

## IN THIS CASE

The doctrine of judicial estoppel has long been recognized and applied in both the federal and California courts. The purpose of the doctrine is "to protect the integrity of the judicial process" (Edwards v. Aetna Life Ins. Co. (6th cir., 1982) 690 F.2d 595, 598) by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.' (United States v. McCaskey (5th Cir. 1993) 9 F.3d 368, 378.)  As was explained in New Hampshire v. Maine (2001) 532 U.S. 742, 121 S.Ct. 1808, citing Davis v. Wakelee (1895) 156 U.S. 680, 689, 15 S.Ct. 555, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . .".

The California courts also apply the doctrine of judicial

estoppel:

> Judicial estoppel prevents a party from
> asserting a position in a legal proceeding
> that is contrary to a position previously
> taken in the same or some earlier
> proceeding. The doctrine serves a clear
> purpose: to protect the integrity of the
> judicial process. (Jackson v. County of Los
> Angeles (1997) 60 Cal.App.4th 171, 181,
> quoting Cleveland v. Policy Management
> Systems Corp. (5th cir. 1997) 120 F.3d 513,
> 517, fn. omitted.)

> Judicial estoppel is intended to protect
> against a litigant playing fast and loose with
> the courts. (Jackson, supra, 60 Cal.App.4th
> at 181, citing Russell v. Rolfs (9th cir. 1990)
> 893 F.2d 1033, 1037.)

> It seems patently wrong to allow a person to
> abuse the judicial process by first
> [advocating] one position, and later, if it
> becomes beneficial, to assert the opposite.
> (Jackson, supra, 60 Cal.App.4th at 181,
> citing *The Judiciary Says, You Can't Have
> It Both Ways: Judicial Estoppel-A Doctrine
> Precluding Inconsistent Positions* (1996) 30
> Loyola L.A.L.Rev. 323, 327.)

In this case, as will be shown, the State of California seeks to

continue to detain the defendant indefinitely based on a diagnostic

theory which the State has recently and specifically repudiated in a

30

voluntary agreement in a federal court.  Specifically, on May 2, 2006,

the United States of America filed a Complaint against the State of

California and various individual defendants in their official

capacities as representatives of the State of California, alleging

violations of the Fourteenth Amendment of the United States

Constitution and Violations of the Americans with Disabilities Act.

The Complaint was based on the premise that DMH facilities are

devoted to the care of persons with significant mental illness and

must therefore be operated in a manner with protects their civil and

Fourteenth Amendment rights and conforms to the strictures of the

Americans With Disabilities Act. ("ADA").  According to the

Complaint, the targeted DMH hospitals "have failed and continue to

fail to assess individuals . . .to ascertain whether these individuals are,

within the confines of any court-ordered treatment, receiving

adequate treatment . . . in the most integrated setting appropriate to

their individual needs" (including being appropriately considered for

and placed in community treatment when appropriate.) (CT 294-295,

RJN.)  The Complaint sought to "enjoin the named Defendants from

egregiously and flagrantly depriving individuals" housed in various

31

California state hospitals "of rights, privileges or immunities secured and protected by the Constitution and laws of the United States.[9] (CT 291.)

Simultaneously with the complaint, the parties to the Mayberg case filed a 90-page "Consent Judgment" which set forth many conditions by which the State and its representatives agreed to be bound. These conditions were designed to improve the adequacy of diagnostic and treatment procedures at DMH hospitals. The purpose of the Consent Judgment was to implement diagnostic and treatment practices at the state hospitals which better meet the diagnostic and

---

[9]

The litigation is entitled "United States of America v. State of California, et al." United States District Court, Central District of California, Western Division Case No. CV-06-2667 GPS. The Complaint is signed by former United States Attorney General Alberto Gonzales personally. (CT 297, 299.) Among the named individual defendants are Arnold Schwarzenegger, Governor, and Stephen W. Mayberg, Director of the California Department of Mental Health in his official capacity only. The litigation will be referred to herein as "the Mayberg" case or action. Concurrently with this brief appellant submits a Request for Judicial Notice ("RJN") of the District Court docket in the Mayberg case. Other documents related to the Mayberg case are already included in the record on appeal. (CT 141-233, 283-300.)

32

rehabilitative mission of those hospitals. (CT 141-247.)[10]

The Consent Judgment was signed by the District Court on May 15, 2006 and entered on May 16, 2006. (CT 141, 231.)

Of particular import to the instant case is paragraph D(1)(d) on page 22 of the Consent Judgment.[11] (CT 162). That provision requires that "each State Hospital shall ensure that (i) clinically justifiable diagnoses are provided for each individual, and all diagnoses that cannot be clinically justified for an individual are

---

[10]

The original consent decree did not specifically mention Atascadero State Hospital ("ASH"), the institution where the appellant had been housed for ten years at the time of trial, and the institution where Dr. Scherrer, one of the two evaluators relied on by the People in the SVP proceeding, was a staff employee (RT 10/6, p. 17). However, on August 2, 2006 the Mayberg parties entered into a stipulation to amend the Consent Judgment to specifically include ASH and its director, Melvin E. Hunter. (CT 283-288.) The complaint was also amended to reflect this addition. (CT 290-300.)

[11]

Part "D" of the Consent Judgment deals with "integrated assessments". Subpart "1" of part "D" deal with "Psychiatric Assessments and Diagnoses". Sub-subpart "d" of "(D)(1)" sets out the substantive standards for psychiatric assessments. It is surrounded and contextualized by sub-subpart "c", which sets out time frames for initial medical/psychiatric assessments and their integration into tentative treatment plans and "e", which mandates that re-assessments occur monthly (weekly during the first two months after admission.)

discontinued no later than the next review." To this end,
subparagraph (d)(iii) mandates that, *inter alia*, "NOS" diagnoses
[such as that imposed on appellant by Drs. Scherrer and Arnold as the
dominant diagnosis in this case] are "timely addressed (i.e. within 60
days), through clinically appropriate assessments, and resolved in a
clinically justifiable manner." (CT 162.)

The reason for the United States concern about NOS diagnoses
is self-evident. Although "NOS" diagnoses appears in the Diagnostic
and Statistical Manual of Mental Disorders ("DSM IV"), as a sub-
category of paraphilia, the Manual itself explicitly states that while
diagnosticians may resort to "NOS" labels as fallbacks, "NOS"
diagnoses are neither complete nor effective. Rather, the label is
applied only where the diagnosis is, by its nature, tentative or
imprecise. They apply when (1) the symptomatic picture does not
meet the criteria for any specific disorders because the symptoms are
below the diagnostic threshold . . . (2) the symptoms conform to a
pattern which has not been included in the DSM absent further
research; (3) there is uncertainty about etiology; and (4) the
diagnostician lacks sufficient information to complete the diagnosis.

34

(Diagnostic and Statistical Manual of Mental Disorders, Am.

Psychiatric Assn. 4th Ed., 1994 ("DSM IV"), p. 4, Use of the Manual:

Use of Not Otherwise Specified Categories.")

In deciding whether to apply the doctrine of judicial estoppel in

a given circumstance, the courts look to (1) the obviousness of the

inconsistency between a party's respective positions on the respective

occasions and (2) whether the position initially asserted was to the

benefit of the party. (New Hampshire v. Maine, supra, 532 U.S. at

750-751.)  In this case, both factors compel a conclusion that the

State is barred from prosecuting the Petitions against the appellant on

the basis of an NOS diagnoses that has not been "resolved" for over

ten years.   First, it is manifestly inconsistent for the State to maintain,

as it does here, that a dominant diagnosis of paraphilia NOS is a

complete and stable diagnoses when, in the Consent Judgment it

voluntarily entered into in Mayberg, it stipulated that such a

diagnoses is incomplete and only preliminary to a true, "clinically

justifiable" diagnosis.  Secondly, the State clearly obtained a benefit

by entering into the Consent Judgment–at a minimum, it avoided

protracted litigation which could have led to far more sweeping and

35

drastic consequences than resulted from the Consent Judgment.

Thus, the Mayberg Consent Judgment entered into between the United States and the State of California and its representatives implicitly recognized what the introduction to the DSM IV makes clear: "NOS" diagnoses are inherently limited and imprecise. Although useful as an initial diagnoses pending further investigation, a persistent NOS label as a primary diagnosis may well be a sign that the patient, despite some symptoms of mental disease, may not actually suffer form any identifiable and treatable disease. This appears to be the very situation in this case: despite years of evaluation, the State's physicians have never been able to "timely address" (as required by the Consent Judgment) the true nature of the defendant's condition, or resolve it in a "clinically justified manner." (CT 162.) As is set forth above, involuntary confinement of a patient for more than 60 days based on a partial "NOS" diagnosis constitutes a violation of the Consent Judgment which the State and the DMH voluntarily entered into in May 2006. Continued confinement of the defendant based on this diagnosis constitutes a violation of his

36

Constitutional rights under the Fifth and Fourteenth Amendments as well as a violation of the Americans with Disabilities Act.

## III.

### THE PETITIONS SHOULD HAVE BEEN DISMISSED BECAUSE THE PEOPLE FAILED TO ALLEGE OR PROVE A "RECENT OVERT ACT"

As is set forth above, SVP Petitions may only be initiated against persons in the custody of the Department of Corrections ("DOC"). (§6601, subd. (a)(1).) Typically the SVP-candidate is in the custody of the DOC as a result of his conviction for a sex crime when SVP proceedings are commenced. This truism presents a dilemma, however, which was recognized in People v. Martin (1980) 107 Cal.App.3d 714, in the context of the Mentally Disordered Sex Offender ("MDSO") law, a precursor of the SVP law.

In Martin, the court recognized that because most SVP candidates are in custody and thus unable to commit new sex offenses, it becomes very difficult for the State to prove that these inmates are imminently likely to re-offend when released. Accordingly, Martin held that when an MDSO-candidate has been

37

imprisoned, the State need not point to any recent sexual misconduct

to show that his mental disorder is not in remission.  Specifically, the

Martin court held:

> Appellant also argues that due process always
> demands that a prediction of dangerousness be
> corroborated by a *recent overt act* in indicating
> dangerousness.  We reject this contention.  We
> need not address the question of whether such a
> requirement should be imposed in some contexts;
> we are satisfied that no such requirement should
> exist in the present one.  Due process does not
> require that the absurd be done before a
> compelling state interest can be vindicated.  As in
> the present case, an MDSO may have a
> predisposition to commit a specific type of sexual
> offense—one that cannot, as a practical matter, be
> committed during confinement. " (Martin, supra,
> 107 Cal.App.3d 725 [italic emph. in original;
> underlined emph. added].)

The Martin rationale—that the state does not have to prove a

recent overt act when the defendant was effectively precluded, by

virtue of his custody, of committing a recent overt act-- was later

incorporated into section 6600, subdivision (d) of the SVPA, which

provides that proof that a person presents a "'[d]anger to the health

and safety of others' does not require proof of a recent overt act while

the offender is in custody." [emph. added.]

38

This language begs the question of whether the requirement that the state does not have to prove a "recent overt act" _if the offender is in custody_ necessarily implicates the "negative pregnant" of that provision: that the state _does_ have to prove a "recent overt act" if the offender has _not_ been in custody.

Such is the situation here. In this case, appellant had completed his prison term for the underlying sex crimes, and was paroled in 1993. He remained at large in the community for approximately two years without committing any new sex crimes. He was not subjected to SVP proceedings until his arrest in 1996. That arrest was _not_ for a new sexual offense; rather, it was a misdemeanor, non-sexual drunk in public arrest. (RT 10/6, p. 79, RT 10/11, p. 343, RT 10/10, p. 206, RT 10/13, p. 323, CT 18-20.) Appellant contends that, since he was out of custody for an extended period of time, the State is required to allege and prove a recent overt act in order to proceed on the Petitions.

39

**A.**   **Principles of statutory construction compel a finding that a recent overt act is necessary when the SVP candidate has been out of custody for an extended period of time**

It is a basic principle of statutory construction that courts should "avoid surplusage, give effect to each portion of the statute and harmonize each part of the entire statutory scheme." (Fontana Unified School District v. Burman (1988) 45 Cal.3d 208, 221; People v. Avena (1996) 13 Cal.4th 394, 427; In re Luke W. (2001) 88 Cal.App.4th 650, 656.)

With respect to §6600, subdivision (d), ("'Danger to the health and safety of others' does not require proof of a recent overt act while the offender is in custody"), the words "while the offender is in custody" are plainly surplusage unless they are construed to have a specific and intended meaning.  That meaning is plain and consistent with the Martin decision: if the person has been in custody, and thus unable to commit a "recent overt act" the State will not be required to prove such an act.  If however he has not been in custody, and thus has had the ability to commit a recent overt act, the State should have to allege and prove that he has done so.  If the Legislature had intended to exempt all cases from proof of a "recent overt act" it

40

could have easily done so by stating: "'[d]anger to the health and safety of others' does not require proof of a recent overt act" and omitting the "while the offender is in custody" language. That the Legislature included this language is dispositive of its intent. (See United States v. Monsanto (1989) 491 U.S. 600, 611, 109 S.Ct. 2657, citing United States v. Naftalin (1979) 441 U.S. 768, 773, 99 S.Ct. 2077 ["The short answer is that Congress did not write the statute that way."].) The alternative interpretation requires a finding that the words "while the offender is in custody" has no meaning at all, a conclusion which flies in the face of the established rules of statutory construction.

**B.     Due process requires a finding that the defendant must have committed a 'recent overt act' if the petition is initiated after he has been out of custody following his last sexual violation**

Although this issue appears to present a question of first impression in California, it is not without precedent. At least two other state Supreme Courts have ruled that an SVP candidate must have committed a "recent overt act" if the petition is initiated after he has been released for his last sexual violation.

41

In <u>In re Young</u> (Wash., 1993) 122 Wn.2d 1, 857 P.2d 989, the

Washington Supreme Court held that to prove an SVP petition

against a person not in custody at the time the petition is initiated, the

state must show that the suspected predator engaged in a "recent overt

act" of criminal sexual misconduct. <u>Young</u> distinguished the problem

before it from the proposition that the state must prove a "recent" act

against a suspected predator who has bee incarcerated for a protracted

period prior to the filing of the commitment petition. In that regard,

the <u>Young</u> court cited <u>Martin, supra,</u> 107 Cal.App.3d at 725, with

approval. (<u>Young, supra,</u> 122 Wn. at 41.) The <u>Young</u> court went on

to make the crucial distinction that <u>Martin</u> declined to make:

> . . . where an individual has been released from
> confinement on a sex offense and lives in the
> community immediately prior to the initiation of
> sex predator proceedings, the above rationale does
> not apply . . .[and] proof of a recent overt act is
> necessary to satisfy due process concerns when an
> individual has been released to the community.
> (<u>Id.</u>, citing <u>In re Harris</u> (1982) 98 Wn.2d 276, 284,
> 654 P.2d 109.) When an individual has been in
> the community, the State has the opportunity to
> prove dangerousness through evidence of a recent
> overt act. We construe statutes to render them
> constitutional. Therefore, we hold that the State
> must present evidence of a recent overt act . . .

42

whenever the individual is not incarcerated at the
time the petition is filed. (<u>Id.</u>)

Although the <u>Young</u> court did not directly address the exact
question specifically before this court–whether it is Constitutional to
file an SVP petition when the suspected offender is in custody, but
not for a sexual offense, that question was answered in appellant's
favor in <u>In re Gonzalez</u> (Iowa Sup. Ct. 2003) 658 N.W.2d 102.

Gonzalez, like appellant here, was confined for a non-sexual
offense at the time the petition against him was initiated. He argued
that prosecution of the SVP proceedings violated due process and that
their resolution against him was unsupported by substantial evidence.
(<u>Id.</u>, at 102-103.) His analysis commenced with Iowa's statutory
scheme, which, unlike California's, distinguishes between petitions
initiated against suspected predators who are in custody and those
who are not; in the later instance, the statutes require proof of a
"recent overt act". Gonzalez argued that because he was in custody
exclusively for non-sexual conduct, he was in parity with persons
who were not confined at all and that the state had to prove a "recent
overt act." The state argued that the statutes contained no such

43

explicit requirement and that if the Legislature had so intended, "it would have said so." (Id., at 104.)  The Iowa Supreme Court rejected the state's argument on due process grounds. The court noted:

> [b]y interpreting the statute as the State urges us (applying the 'confined person' basis for commitment) the State would be relieved of showing a "recent overt act." . . . [T]he result would not be a reasonable application of the statute because it would allow the State to reach back in time, seize on a sexually violent offense for which defendant was discharged, and couple this with a present confinement for a totally different–or even perhaps a trivial –offense and use Chapter 229A to confine the person –This would raise serious Constitutional issues. (Id., at 104-105.)

The Iowa Supreme Court concluded that the Petition against Gonzalez must fail "[b]ecause Gonzalez was not confined for a sexually violent offense at the time the petition was filed, and the State failed to prove, or even allege, a recent overt act." (Id., at 106.)

The Constitutional approach adopted by Gonzalez is impelled by decisions of the federal courts construing the Due Process Clause of the federal Constitution.  Confinement as a predator must be predicated on a showing that the suspected offender likely will be

44

dangerous in the sense that he cannot control his behavior. (<u>Kansas v.</u>

<u>Crane</u> (2002) 534 U.S. 407, 122 S.Ct. 867.)

> While the actual assessment of the likelihood of
> danger calls for an exercise of medical judgment,
> the sufficiency of the evidence to support such a
> determination is fundamentally a legal question.
> A mere expectancy that danger-productive
> behavior might be engaged in does not rise to the
> level of legal significance when the consequences
> of such an evaluation is involuntary commitment.
> To confine a citizen against his will because he is
> likely to be dangerous in the future, *it must be*
> *shown that he has actually been dangerous in the*
> *recent past and that such danger was manifested*
> *by an overt act*, attempt or threat to harm . . .
> another. (<u>Lynch v. Baxley</u> (M.D. Ala. 1974) 386
> F.Supp. 378, 391 [emph. added], cited in
> <u>Gonzalez</u>, <u>supra</u>, 658 N.W. 2d at 105.)

In the instant case, the appellant's last act of criminal sexual

violence occurred a quarter century ago. What distinguishes his case

from many other sexual predator cases in which the last act of sexual

violence was years before, is the fact that the appellant was released

into the community where he lived for approximately two years

without engaging in any new criminal sexual violence.

On these facts the appellant is entitled to dismissal of the

Petitions against him and to immediate release. The state has neither

alleged nor proven a recent overt act of criminal sexual violence which is implicitly required by California's statutory scheme and which is explicitly required by the Due Process Clause of the state and federal Constitutions.

## IV.

## THE PETITIONS MUST BE DISMISSED BECAUSE THEY WERE NOT SUPPORTED BY THE EVALUATIONS OF TWO, INDEPENDENT PSYCHOLOGISTS OR PSYCHIATRISTS AS REQUIRED BY SECTION 6601

Welfare & Institutions Code section 6601 requires that a potential SVP candidate be evaluated by two practicing psychiatrists or psychologists, or one practicing psychiatrist and one practicing psychologist, designated by the Director of Mental Health. (§6601, subd. (d).) A petition for commitment may be filed only if <u>both</u> evaluators concur that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody. (§6601, subds. (d) and (f).)

Critically, subdivision (g) provides:

46

> (g) Any independent professional who is designated by the Director of Corrections or the Director of Mental Health for purposes of this section ***shall not be a state government employee***, shall have at least five years of experience in the diagnosis and treatment of mental disorders, and shall include psychiatrists and licensed psychologists who have a doctoral degree in psychology. ***The requirements set forth in this section also shall apply to any professionals appointed by the court to evaluate the person for purposes of any other proceedings under this article.***

In the instant case, two psychologists testified in support of the People's petitions for continued commitment. One of those, Dr. Mark Scherrer, is a state government employee, and thus is disqualified from acting as an "independent professional" for any proceeding in pursuant to the SVPA.

Specifically, the following testimony was elicited at the probable cause hearing of July 17, 2006:

> Mr. Bergerson: Dr. Scherrer, by whom are you employed?
> . . .
> A. I am employed at Atascadero State Hospital.
> Q. Okay. When you say you are employed by Atascadero State Hospital, you are a member of the staff at Atascadero State Hospital?

47

A. Yes.  I am a member of the medical staff.

. . .

Q. Okay.  Do you have your own independent psychological practice as well as the practice that you have from Atascadero State Hospital?

A. I don't currently, no.

Q. Okay.  And when is the last time you were in independent practice?

A. Approximately three years.

Q. Okay.  So it's fair to say that at least in 2004 and 2005 and 2006, you were employed exclusively by the State of California, Atascadero State Mental Hospital?

A. I think that's fair.

(RT 7/17, pp. 39-40.)

Similarly, at the trial on the 2002-2004 Petitions, Dr. Scherrer again testified that "I am currently employed at Atascadero State Hospital." (RT 10/6, p. 17.)

Because Dr. Scherrer plainly is a State employee, his evaluation of the defendant could neither satisfy the statutory prerequisite to the filing of the Petitions, nor should his evaluations have been admitted "for purposes of any other proceedings under this article." (§6601, subd. (g).)

Moreover and alternatively, from a strictly evidentiary standpoint, the testimony should not have been admitted at all because Dr. Scherrer is an employee of the State.  The admission of

48

Dr. Scherrer's testimony and reports was plainly prejudicial since his testimony constituted the bulk of the People's case. Absent his testimony the jury would have heard conflicting opinions of one prosecution and one defense psychologist and it would have been highly likely that they would not have returned a true finding on the Petitions. Therefore, reversal is required.

## V.

## RETROACTIVE APPLICATION OF THE AMENDED STATUTES TO THE 2002/2004 PETITIONS VIOLATES APPELLANT'S DUE PROCESS RIGHTS

As is set forth above, appellant contends that the trial court was (1) without jurisdiction to try him on any Petition because the September 2006 amendment to sections 6604 and 6604.1 repealed the only statutory authority for recommitment proceedings; (2) the People are judicially estopped to proceed on the Petitions based on the Consent Judgment in the Mayberg case; (3) the People were precluded from proceeding on the Petitions because they failed to allege or prove a recent overt act; and (4) the People were precluded

49

from proceeding on the petitions because they failed to obtain

evaluations from two independent psychologists or psychiatrists.

However, assuming, arguendo, that the People are not barred from

proceeding on the re-commitment proceedings on any or all of these

grounds, the trial court nevertheless erred in retroactively applying

the new indeterminate term provisions of the amended statute to the

2002 and 2004 petitions.

In the instant case, the defendant was not tried on the 2002 and

2004 Petitions until October 2006. By the time these Petitions were

tried, the defendant had already completed the two-year commitment

terms applicable to both of these petitions. Indeed, the commitment

term for the 2004 Petition expired on July 22, 2006, months before

the trial, and months before the indeterminate term amendment to

sections 6604 and 6604.1. Nevertheless, after the trial, the court

retroactively applied the amended statute, which did not even exist at

the time the relevant Petitions were filed or at any time during the

commitment term sought by those Petitions, to impose upon the

defendant an indeterminate commitment to the DMH. This

50

commitment constitutes reversible error as well as a violation of the

defendant's constitutionally guaranteed right to due process.

It is long-established that statutes are deemed to apply

prospectively only unless the Legislature has unequivocally and

inflexibly manifested an intention of retroactive application. (United

States v. Security Industrial Bank (1982) 459 U.S. 70, 79-80 [74

L.Ed.2d 235, 243-244, 103 S.Ct. 407]; Evangelatos v. Superior Court

(1988) 44 Cal.3d 1188, 1206-1207.) A statute affecting a substantive

right, such as the liberty interest at stake in SVPA proceedings, will,

if possible, be construed prospectively to avoid a declaration of

unconstitutionality. (See Evangelatos v. Superior Court, supra, 44

Cal.3d 1188, 1207; 7 Witkin Sum. Cal. Law, Const Law § 633.)

Because there is no unequivocal statement of legislative intent that

the provisions of SB 1128 amending the SVPA are to apply

retroactively, any such application would run afoul of the due process

clauses of both the state and federal constitutions.

> [T]he presumption against retroactive legislation is
> deeply rooted in our jurisprudence, and embodies
> a legal doctrine centuries older than our Republic.
> Elementary considerations of fairness dictate that
> individuals should have an opportunity to know

51

> what the law is and to conform their conduct
> accordingly; settled expectations should not be
> lightly disrupted. (Landgraf v. USI Film Products
> (1994) 511 U.S. 244, 265 [128 L.Ed.2d 229, 114
> S.Ct. 1483] fn. omitted.)

'[T]he antiretroactivity principle finds expression in several

provisions of our Constitution,' including the ex post facto clause, the

provision prohibiting the impairment of obligations of contracts, the

Fifth Amendment's takings clause, the prohibition of bills of

attainder, and the due process clause. ( *Id*. at p. 266.)" (McClung v.

Employment Development Dept. (2004) 34 Cal.4th 467, 479.)

With respect to the SVPA specifically, our California Supreme

Court has concluded that because SVPA proceedings are civil, and

not punitive in nature, they are not subject to ex post facto challenges.

(Hubbart v. Superior Court (1999) 19 Cal.4th 1138, 1170-1179.)

Nevertheless, as is set forth above, they are subject to due process

challenges. (People v. Hurtado, supra, 28 Cal.4th at pp. 1192, 1194;

People v. Otto, supra, 26 Cal.4th 200, 209, Foucha v. Louisiana,

supra, 504 U.S. 71, 80 [112 S.Ct. 1780, 1785-1786, 118 L.Ed.2d

437].).

Having established that a respondent in an SVP case is entitled

to due process, ". . . the question remains what process is due."

(<u>Morrissey v. Brewer</u> (1972) 408 U.S. 471, 481 [92 S.Ct. 2593, 2600,

33 L.Ed.2d 484].)  The California Supreme Court answered this

question in <u>In re Malinda S.</u>  (1990) 51 Cal.3d 368 when it identified

four relevant factors to the question of whether due process

protections have been satisfied:

> (1) the private interest that will be affected
> by the official action; (2) the risk of an
> erroneous deprivation of such interest
> through the procedures used, and the
> probable value, if any, of additional or
> substitute procedural safeguards; (3) the
> government's interest, including the
> function involved and the fiscal and
> administrative burdens that the additional or
> substitute procedural requirement would
> entail; and (4) the dignitary interest in
> informing individuals of the nature,
> grounds, and consequences of the action and
> in enabling them to present their side of the
> story before a responsible government
> official. (<u>Malinda S.</u>, <u>supra</u>, 51 Cal.3d at p.
> 383.)

Here, applying the <u>Malinda S.</u> factors, it is apparent that the

trial court's error in retroactively applying the new, indeterminate

term provision to the 2002 and 2004 petitions, was not harmless

beyond a reasonable doubt.

First, it is well-established that virtually all defendants in SVP cases are greatly impacted by the outcome of the proceedings; "the private interests that will be affected by the official action are significant limitations on [appellant's] liberty, the stigma of being classified as an SVP, and subjection to unwanted treatment." (Otto, supra, 26 Cal.4th at 210; Hurtado, supra, 28 Cal.4th at 1194, People v. Carlin (2007) 150 Cal.App.2d 322, 340.)

The second factor, too, militates strongly in appellant's favor. The risk of an erroneous deprivation of the appellant's unquestionably significant private interest is enormous when a statute is retroactively applied to increase the term of custody from two years to an indeterminate, possibly life term.

The third factor, the government's interest and reduction of fiscal and administrative burdens, pales in comparison to the burden of a lifetime commitment imposed on the defendant. Moreover, although the Government certainly has an interest in protecting the public from dangerous sex offenders, it can readily do so under the former statute which required the Government to petition to extend

the commitment every two years, particularly since the old law now

applies only to the relatively small number of persons who were

already committed prior to the amendment.[12]

Finally, the fourth factor also weighs heavily in the defendant's

favor. If the government is permitted to unilaterally and dramatically

change the stakes years after the "game" has been commenced, then

the defendant's "dignitary interest" in knowing "the nature, grounds,

and consequences of the action" is utterly destroyed.

Based on the four factors enunciated by our Supreme Court to

determine the extent of one's due process rights, it is clear that

retroactive application of the new, indeterminate term provision of the

SVPA to this defendant constitutes a gross violation of his

Constitutionally guaranteed rights to due process. The error is plainly

not harmless beyond a reasonable doubt. The indeterminate

commitment must be vacated and a two-year commitment imposed

---

[12]

And this only assuming that the amendments apply at all to
extended commitments. As is set forth in section I above, appellant
contends the amendments effectively repealed any provision for
extended commitments of persons already committed at the time of
the amendment.

55

pursuant to the former statutes. Moreover, since the defendant has

long-since served the requisite two-year commitments for both the

2004 and 2006 petitions, and the 2006 Petition has been dismissed,

he is entitled to immediate release.

## VI.

### ASSUMING, ARGUENDO, THAT THE

### INDETERMINATE COMMITMENT IS VALID,

### THE TRIAL COURT ERRED IN

### DISMISSING THE 2006 PETITION

On October 23, 2006, a few days after Judge Morgan imposed

an indeterminate commitment term on the defendant based on the true

finding on the 2002-2004 Petitions, the People moved Judge McBride

to dismiss the pending 2006 Petition.[13] Over defense objection, the

motion was granted and the Petition dismissed. (RT 10/23, p. 3-5.)

As is set forth above, appellant contends that he should have

been subjected, at most, only to the two-year commitment provided

---

[13]

      At that time, the court clarified that the People were moving to
"dismiss" the Petition, as opposed to "withdraw" the Petition. (RT
10/23, 2-3.)

56

for under the former statute as to the 2002 and 2004 Petitions, and

that he should be released since he has already served those two, two-

year commitments and no other Petition is pending. However, in the

event this court holds that the indeterminate term was properly

applied to the 2002 and 2004 Petitions, then appellant asserts that the

2006 Petition should not have been dismissed, and he should have

been given the opportunity to litigate the allegations in that Petition.

> [A]n SVP extension hearing is not a review
> hearing. It is not the mere continuation of an
> earlier proceeding and, except in a limited
> sense, the petitioner cannot rely on findings
> made at earlier SVP hearings to shape the
> issues or to prove SVP status in a current
> proceeding. <u>An SVP extension hearing is a
> new and independent proceeding at which,
> with limited exceptions, the petitioner must
> prove the defendant meets the criteria,
> including that he or she has a ***currently
> diagnosed*** mental disorder that renders the
> person dangerous.</u>" (See <u>People v. Munoz</u>
> (2005) 129 Cal.App.4th 421, 429-430;
> <u>Butler v. Superior Court</u> (2000) 78
> Cal.App.4th 1171, 1179-1182 [Legislature
> intended recommitment petition to be based
> on the SVP's mental condition at the end of
> the initial two-year term] [emph. added].)

Had the People failed to obtain a true finding from the jury in

the trial of the 2002-2004 Petitions, they clearly would not have

hesitated to immediately commence a new trial on the 2006 Petition, thus granting themselves another bite of the SVP apple.  Yet, once the People prevailed on the 2002-2004 Petitions, they intentionally deprived the defendant of the opportunity to defend himself and possibly vindicate himself against those same allegations.  As a matter of due process and fundamental fairness, if the defendant is to be subjected to an indeterminate term on the pre-amendment 2002 and 2004 Petitions, he should be allowed the opportunity to defend the allegations of the 2006 petition.

## CONCLUSION

For all the foregoing reasons, the true finding on the 2002/2004 Petitions should be reversed.  If the true finding as to the 2002/2004 Petitions are not reversed, then the matter should be remanded for a trial on the 2006 Petition.

Respectfully submitted,

DATED: _11/3/07_

MAZUR & MAZUR
Janice R. Mazur
William E. Mazur, Jr.
By: _____
    Janice R. Mazur,
    Attorneys for appellant
    Scott Felix

## CERTIFICATE OF WORD COUNT

The undersigned certifies that this Brief contains 11,183 words, as counted by the WordPerfect word processing program used to generate this brief.

DATED: ___11/3/07___

_____
JANICE R. MAZUR, attorney
for appellant

59

## AFFIDAVIT OF SERVICE BY MAIL

I am employed in the State of California, County of San Diego. I am over the age of eighteen and not a party to this action. My business address is 13465 Camino Canada, No. 106, El Cajon, CA 92021.

On November 14, 2007, I mailed documents described as **APPELLANT'S OPENING BRIEF** via the United States mail in Whitefish, Montana in postage prepaid envelopes to interested parties in this action addressed as following:

See Attached Service List

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 14, 2007.

JANICE R. MAZUR

Service List, People v. Felix, Case No. A115717

Office of the Attorney General
455 Golden Gate Ave.
#11000
San Francisco, CA 94102

San Francisco Superior Court
850 Bryant St.
San Francisco, CA 94103
Attn: Judge Morgan

San Francisco Superior Court
850 Bryant St.
San Francisco, CA 94103
Attn: Judge McBride

Scott Felix (Appellant)

California Supreme Court
350 McAllister St.
San Francisco, CA 94102

District Attorney
850 Bryant St., Room 322
San Francisco, CA 94103

Kenneth Quigley (Trial Counsel)
650 Fifth St., Suite 502
San Francisco, CA 94107