EXHIBIT - 5

THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT

CASE No. A115717

DATED DECEMBER 16TH 2008

CERTIFIED FOR PARTIAL PUBLICATION

COPY

Filed 12/16/08

## CERTIFIED FOR PARTIAL PUBLICATION[*]

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

#### FIRST APPELLATE DISTRICT

##### DIVISION FIVE

THE PEOPLE,

    Petitioner and Respondent,

v.

SCOTT EMERSON FELIX,

    Respondent and Appellant.

A115717

(City & County of San Francisco
Super. Ct. No. 109100)

Felix challenges his civil commitment after a jury trial to an indeterminate term of confinement as a sexually violent predator pursuant to the Sexually Violent Predators Act as amended on September 20, 2006. The jury trial took place during October 2006. We affirm.

### BACKGROUND

In 1982, Scott Emerson Felix was convicted of three counts of false imprisonment (Penal Code, § 236) against three separate victims, two counts of oral copulation and one count of rape against two additional victims, and one count of assault with the intent to commit rape against a sixth victim. The crimes were committed in April, October, and September 1982. In each case, Felix approached strangers on the street or in other public places, used threats or force against them, and attempted to or succeeded in forcing them

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, III, V, and VI.

1

to perform sexual acts on him. For these crimes, Felix was sentenced to 19 years four months in prison.

Felix was released on parole sometime before 1993. He had numerous parole violations between October 1993 and December 1995. In May 1994, his parole was revoked for six months. He had been charged with several crimes, including assault and battery, possession of a dangerous weapon, possession of stolen property, and threats or harassment. In March 1995, Felix's parole was revoked for one month, based on a curfew violation, dishonesty, and noncooperation. In August 1995, Felix was arrested for stalking, but his parole was continued. In March 1996, Felix's parole was revoked for nine months for being drunk in public.

While Felix was in custody for the March 1996 parole revocation, the People filed a petition to commit him as a sexually violent predator (SVP) pursuant to the Sexually Violent Predator Act (SVPA), Welfare and Institutions Code section 6600 et seq.[1] Felix was found to be an SVP, was committed to a two-year term, and, pursuant to subsequent petitions to extend his commitment, was ultimately committed through July 22, 2002.

The People filed a petition to extend Felix's commitment from July 22, 2002 to July 22, 2004 (2002 petition). A trial still needed to be held on that petition when July 22, 2004 was approaching, so the People filed a second petition to extend Felix's commitment from July 22, 2004 to July 22, 2006 (2004 petition). The 2002 and 2004 petitions were consolidated in 2004. A trial had still not been held on the consolidated petitions as the expiration date of July 22, 2006 was approaching, so the People filed a third petition to extend Felix's commitment from July 22, 2006 to July 22, 2008 (2006 petition).

---

[1]     All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

As of July 2006, the consolidated 2002 and 2004 petitions had been assigned to Judge Mary Morgan for trial. When the 2006 petition was filed, Felix challenged Judge Morgan pursuant to Penal Code section 170.6, and the 2006 petition alone was assigned to Judge James J. McBride. A probable cause hearing was held on the third petition and probable cause was found to exist. The 2006 petition was eventually scheduled to go to trial October 6, 2006.

On August 1, 2006, Felix filed a motion to dismiss the 2006 petition on the ground of "judicial estoppel." He argued the People were estopped from bringing the petition by virtue of a consent decree California entered into in *United States v. California* (C.D. Cal., 2006, No. CV-06-2667-GPS) *(Mayberg)*. Felix argued that the 2006 petition, which was based on a primary diagnosis of "paraphilia not otherwise specified," conflicted with a term of the consent decree. He argued the consent decree was binding on the People in the instant action under the doctrine of judicial estoppel. The relevant section of the consent decree required the Department of Mental Health (DMH) to ensure that clinically justified diagnoses be provided for each individual under its care and particularly that any "not otherwise specified" diagnoses be "timely addressed (i.e. within 60 days), through clinically appropriate assessments, and resolved in a clinically justifiable manner." Felix argued, "The state seeks to continue detaining Felix on the basis of a diagnostic theory which the state previously repudiated via a voluntary agreement before a Federal Judge. . . . The state must either refine its diagnosis *now*, or dismiss the instant petition." The People opposed the motion, arguing paraphilia not otherwise specified is an appropriate diagnosis under SVPA and that nothing in the consent decree bars the state from seeking SVPA commitment of an individual with that diagnosis.

On August 8, 2006, Felix filed a second motion to dismiss the 2006 petition, which argued that the court's probable cause finding was unsubstantiated because the People failed to allege or prove at the hearing that Felix committed a "recent overt act" of criminal sexual violence prior to the initiation of SVPA proceedings in 1996. The People

3

opposed the motion, arguing the SVPA does not require proof of a recent overt act before a commitment petition may be filed.

On September 11, 2006, Judge McBride denied both motions.

On September 8, 2006, the People moved to consolidate the three pending petitions for trial. The motion was denied. The consolidated 2002 and 2004 petitions remained scheduled for trial before Judge Morgan. The third petition, filed July 2006, was scheduled for trial before Judge McBride.

On September 20, 2006, the Governor signed the Sex Offender Punishment, Control, and Containment Act of 2006 (Stats. 2006, ch. 337; hereafter, Senate Bill No. 1128), which was urgency legislation that went into effect immediately. (Stats. 2006, ch. 337, § 62.) Among other things, Senate Bill No. 1128 changed the term of commitment for SVPs from two years to an indeterminate term. (§ 6604; Stats. 2006, ch. 337, § 55.)

On September 27, 2006, the People moved to amend the pending petitions against Felix so that each would seek commitment for an indeterminate term. On October 3, Judge Morgan granted the motion as to the consolidated 2002 and 2004 petitions "without in any way indicating what kind of commitment I would make if, in fact, the jury found the petition to be true." The court added, "We will litigate that issue later if there is any reason to." As far as the record discloses, Judge McBride never ruled on the motion as to the 2006 petition.

A jury trial on the consolidated 2002 and 2004 petitions took place in October 2006. In the meantime, trial was continued on the 2006 petition. On October 18, 2006, the jury found that Felix was a SVP as defined in section 6600. On October 20, following legal argument on the issue of the appropriate term of commitment, the court committed Felix for an indeterminate term. On October 23, Judge McBride dismissed the 2006 petition over Felix's objections.

4

On October 26, 2006, Felix filed a notice of appeal from the judgment and commitment entered October 20 and the dismissal of the 2006 petition entered on October 23.

### DISCUSSION

I.  *Statutory Authority to File Petition to Extend Petition*[*]

Felix argues Senate Bill No. 1128's amendments to the SVPA eliminated statutory authority to file a petition to extend an existing SVP commitment. We first review the statutory scheme in effect before the September 2006 amendments (former SVPA).[2] We then review the changes effected by the September 2006 amendments. Finally, we address Felix's argument.

A.  *Former SVPA*

Under the former SVPA, the Department of Corrections was required to screen prisoners approaching their release dates to determine if they might be sexually violent predators (SVPs). After screening, if a suspicion existed, the prisoners were referred to the State Department of Mental Health (DMH) for evaluations about whether they met statutory criteria for designation as SVPs. (Former § 6601, subds. (a)(1), (b); Stats. 1999, ch. 136, § 1.) If DMH determined they met those criteria, it requested that the appropriate counties file petitions for commitment, and if the counties' designated

---

[*] See footnote, *ante*, page 1.

[2]    For purposes of clarity, we refer to provisions of the former SVPA (in effect before the September 20, 2006 amendments) in the past tense as "former sections" and provisions adopted by the September 2006 amendments in the present tense as "sections," even though those amendments have been superseded by an initiative adopted by the voters in November 2006 (Proposition 83). Most of the provisions of Senate Bill No. 1128 and the initiative are the same; where they materially differ, we note the difference in a footnote.

counsel concurred, the petitions were verified. (Former § 6601, subds. (h), (i); Stats. 1999, ch. 136, § 1.)

If the superior court determined that a petition established probable cause that the person named was likely to engage in sexually violent predatory criminal behavior upon his or her release, the court ordered a trial on whether the person was an SVP, and ordered the person confined until trial. (Former § 6602, subd. (a); Stats. 2000, ch. 41, § 3.) If after trial the person was found to be an SVP, he was committed to the custody of the DMH for a period of two years. (Former § 6604; Stats. 2000, ch. 420, § 3.) The SVP could "not be kept in actual custody longer than two years unless," as relevant here, "a subsequent extended commitment [wa]s obtained from the court incident to the filing of a petition for extended commitment under this article . . . ." (Former § 6604; Stats. 2000, ch. 420, § 3.) "For any subsequent extended commitments, the term of commitment shall be for two years commencing from the date of the termination of the previous commitment." (Former § 6604.1, subd. (a); Stats. 2000, ch. 420, § 4.)

The former SVPA did not include a section that specifically authorized the filing of petitions for extended commitment. Instead, it provided that "subdivisions (c) to (i), inclusive, of Section 6601 shall apply to . . . extended commitments" and that the "rights, requirements, and procedures set forth in Section 6603 shall apply to extended commitment proceedings." (Former § 6604.1, subd. (b); Stats. 2000, ch. 420, § 4.) Former section 6601, subdivisions (c) to (i) governed DMH evaluations to determine if individuals met the statutory criteria of SVPs, and former section 6603 governed SVP trial procedures. (Former § 6601, subds. (c)-(i); Stats. 1999, ch. 136, § 1, former § 6603; Stats. 2001, ch. 323, § 2.)

Former section 6601, subdivisions (a) and (b), which were *not* made applicable to petitions to extend commitments, governed the screening process for individuals in Department of Corrections custody. (Former § 6604.1, subd. (b); Stats. 2000, ch. 420, § 4.) Section 6601, subdivision (a)(2) provided: "A petition may be filed under this

6

section if the individual was in custody pursuant to his or her determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3, at the time the petition is filed."[3] (Former § 6601, subd. (a)(2); Stats. 1999, ch. 136, § 1.)  In context, a petition "filed under this section" must be interpreted to mean a petition that was initiated under former section 6601, subdivision (a)(1), i.e., by a Department of Corrections screening of individuals in its custody.  If a petition "filed under this section" was interpreted to mean any petition filed under former section 6601 or under the former SVPA, the language would have precluded the filing of any petitions to extend SVP commitments, even though the former SVPA clearly anticipated that extension petitions could be filed.  Persons subject to extension petitions were previously committed as SVPs and therefore were in the custody of the DMH rather than the Department of Corrections.

B.    *September 2006 Amendments (Senate Bill No. 1128)*

Senate Bill No. 1128's amendments to the SVPA were in effect in October 2006 when Felix was tried and ordered committed for an indeterminate term.[4]

As amended by Senate Bill No. 1128, section 6604 provides in relevant part: "If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an *indeterminate term* to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility . . . ." (§ 6604;

---

[3]    The rest of subdivision (a)(2) addressed the issue of how the SVP proceedings would be affected if the Department of Corrections custody was later found to be unlawful.: "A petition shall not be dismissed on the basis of a later judicial or administrative determination that the individual's custody was unlawful, if the unlawful custody was the result of a good faith mistake of fact or law." (Former § 6601, subd. (a)(2); Stats. 1999, ch. 136, § 1.)

[4]    At the November 7, 2006 General Election, the voters approved Proposition 83, an initiative measure, which is very similar to Senate Bill No. 1128. (See Deering's Ann. Welf. & Inst. Code (2008 supp.) note foll. § 6600, p. 43.)  The law adopted by Proposition 83 went into effect November 8, 2006. (*Ibid.*)

7

Stats. 2006, ch. 337, § 55, italics added.) Once committed, the person is evaluated annually by DMH personnel. (§ 6605, subd. (a); Stats. 2006, ch. 337, § 57.) If the DMH determines the person is no longer an SVP, it must seek judicial review of the commitment. If the court finds the person is no longer an SVP, it must unconditionally release him or her. (§ 6605, subd. (f); Stats. 2006, ch. 337, § 57.) The person committed may also petition for release. (§ 6605, subd. (b); Stats. 2006, ch. 337, § 57.) If the court finds probable cause to believe the committed person's condition has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged, the court sets a hearing on the issue at which the state bears the burden of proof beyond a reasonable doubt. (§ 6605, subds. (c), (d); Stats. 2006, ch. 337, § 57.)

As amended by Senate Bill No. 1128, section 6604.1, subdivision (a) provides: "The indeterminate term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section." (§ 6604.1, subd. (a); Stats. 2006, ch. 337, § 56.) All references to an extended commitment in sections 6604 and 6604.1 were deleted by Senate Bill No. 1128.[5] (§§ 6604, 6604.1; Stats. 2006, ch. 337, §§ 55, 56.)

---

[5]     Proposition 83 did not amend section 6604.1, subdivision (b) in the same manner as did Senate Bill No. 1128. It retained references to extended commitments in that subdivision, which now reads as it did before the 2006 amendments: "The provisions of subdivisions (c) to (i), inclusive, of Section 6601 shall apply to evaluations performed for purposes of extended commitments. The rights, requirements, and procedures set forth in Section 6603 shall apply to all commitment proceedings." (§ 6604.1, subd. (b); former § 6604.1, subd. (b); Stats. 2000, ch. 420, § 4.) As amended by Senate Bill No. 1128, section 6604.1, subdivision (b) provided: "The provisions of subdivisions (c) to (i), inclusive, of Section 6601 shall apply to evaluations performed pursuant to a trial conducted pursuant to subdivision (f) of Section 6605. The rights, requirements, and procedures set forth in Section 6603 shall apply to all commitment proceedings." (§ 6604.1, subd. (b); Stats. 2006, ch. 337, § 56.) Section 6605 governs petitions for release from an indeterminate term of commitment. (§ 6605; Stats. 2006, ch. 337, § 57.)

8

## C.   *Statutory Authorization to File Extended Commitments*

We reject Felix's argument that Senate Bill No. 1128 eliminated statutory
authorization to file petitions to extend the commitments of persons who were already
committed as SVPs at the time Senate Bill No. 1128 went into effect. In doing so, we
join two other courts that have reached the same conclusion. (See *People v. Shields*
(2007) 155 Cal.App.4th 559, 561; *People v. Carroll* (2007) 158 Cal.App.4th 503, 510;
see also *Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1279-1280
[Proposition 83 did not eliminate statutory authority to extend the commitments of
persons already committed as SVPs at time initiative took effect].)

The guiding principle of statutory interpretation is to ascertain and give effect to
legislative intent. (*People v. Robles* (2000) 23 Cal.4th 1106, 1111.) Because statutory
language generally is the most reliable indicator of legislative intent, we turn first to the
words of the statute themselves, giving them their usual and ordinary meaning and
construing them in context. (*Ibid.*) "If the language contains no ambiguity, we presume
the Legislature meant what it said, and the plain language of the statute governs.
[Citation.] If, however, the statutory language is susceptible of more than one reasonable
construction, we can look to legislative history in aid of ascertaining legislative intent.
[Citation.]" (*Ibid.*)

The language of Senate Bill No. 1128 is ambiguous about whether a petition for
indeterminate commitment can be filed against a person already committed to the custody
of the DMH as an SVP. First, section 6601, subdivision (a)(2) does not clearly preclude
such petitions, as Felix argues. If read in isolation, the subdivision could be understood
to limit the class of persons subject to petitions for SVP commitment to persons in the
custody of Department of Corrections. However, this language was adopted without
change from the former SVPA and, as explained above, under the former SVPA the
language did not preclude petitions for extended commitment. Rather, section 6601,

9

subdivision (a)(2) referred only to petitions that were initiated by a Department of Corrections screening process.

Second, Senate Bill No. 1128's amendments to sections 6604 and 6604.1 do not expressly preclude petitions for extended commitment. Section 6604 provides that, "[i]f the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term . . . ." (§ 6604; Stats. 2006, ch. 337, § 55.) Nothing in this language precludes its application to a petition to *extend* an SVP commitment as distinct from an initial petition to impose an SVP petition. Section 6604.1, subdivision (a) provides, "The indeterminate term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the *initial* order of commitment pursuant to that section." (§ 6604.1, subd. (a), italics added; Stats. 2006, ch. 337, § 56.) The word "initial" in this sentence does not unambiguously refer to an initial petition for an SVP commitment against a person not previously committed as an SVP. It could be understood to refer to an initial term of commitment *for an indeterminate term*, which might be brought against an individual already committed as an SVP but not yet committed to an indeterminate term. (See *People v. Whaley* (2008) 160 Cal.App.4th 779, 798 [so construing "initial" in § 6604.1, subd. (a)].) Finally, section 6604.1, subdivision (b) no longer contains any express references to petitions for extended commitments. However, nothing in the amended subdivision expressly precludes petitions for extended commitments. Indeed, the last sentence easily encompasses such petitions: "The rights, requirements, and procedures set forth in Section 6603 shall apply to *all* commitment proceedings." (§ 6604.1, subd. (b); Stats. 2006, ch. 337, § 56, italics added.)

We conclude, therefore, that the plain language SVPA as amended by Senate Bill No. 1128 is ambiguous on the issue of whether petitions for extended commitments are allowed. Accordingly, we look to other indicia of legislative intent to resolve these ambiguities in the statutory language. Felix has not produced any legislative history of

10

Senate .Bill No. 1128 to guide this process. However, courts have held that the intent of the former SVPA was "to protect the public from a select group of *extremely dangerous offenders* and to provide treatment for those people. [Citation.]" (*Carroll, supra,* 158 Cal.App.4th at p. 510, italics added.) When SVPA was passed in 1995, the Legislature stated its intent as follows: "It is the intent of the Legislature that once identified, these individuals, if found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt, be confined and treated until such time that it can be determined that they no longer present a threat to society." (Stats. 1995, ch. 762, § 1 (Senate Bill No. 1143).) Moreover, the primary effect of Senate Bill No. 1128 on the SVPA—changing the two-year term of commitment to an indeterminate term that ends only on a showing that the person is no longer an SVP—strongly implies a purpose to strengthen the state's power to confine persons determined to be SVPs. (See *ibid.*; *Shields, supra,* 155 Cal.App.4th at p. 563.) It would be entirely inconsistent with this purpose to interpret the SVPA as amended by Senate Bill No. 1128 to bar the state from petitioning to extend the commitment of persons already determined to be SVPs. If the state did not have this power, those SVPs would have to be released at the end of their determinate terms without any showing that their condition has so changed and improved that it was no longer likely they would commit a sexually violent crime once discharged. They could not be subjected to new SVP proceedings unless and until they came into the custody of the Department of Corrections. This result is clearly counter to the legislative purpose in enacting the original SVPA in 1995 and in amending it in 2006.

We therefore construe the SVPA as amended by Senate Bill No. 1128 to authorize the state to file petitions seeking to extend the commitment terms of persons who were already committed as SVPs at the time Senate Bill No. 1128 went into effect.[6]

---

[6]     Because we conclude the statutory language is ambiguous and is most reasonably interpreted to authorize the filing of extension petitions in light of the Legislature's intent, we need not decide whether to supply missing statutory terms under the theories of an

11

Section 6601, subdivision (a)(2) applies only to petitions filed against persons who are initially identified as possible SVPs while in the custody of the Department of Corrections, pursuant to subdivisions (a) and (b) of section 6601. Subdivisions (c) to (i) of section 6601 authorize, as they did under the former SVPA, DMH to evaluate persons already committed as SVPs, determine if they are still SVPs, and request that counties file petitions for extended commitment; and authorize county counsel to file such petitions.[7]

II. *Retroactive Application of Senate Bill No. 1128*[*]

Felix argues that application of Senate Bill No. 1128 to the consolidated 2002 and 2004 petitions violates his due process rights.[8]

In addressing a retroactivity challenge, we first determine whether the law has been retroactively applied. If so, we decide whether the Legislature intended that the statute be applied retroactively. If we find the Legislature did so intend, we consider whether the retroactive application is constitutional. (*Yoshioka v. Superior Court* (1997) 58 Cal.App.4th 972, 979.)

"In order for a law to be retrospective, it must apply to events occurring before it was enacted. [Citation.] Stated another way, '[a] statute has retrospective effect when it substantially changes the legal consequences of *past* events. [Citation.].' [Citation.] 'Thus, the critical question for determining retroactivity usually is whether the *last act or*

---

implied savings clause (see *Bourquez, supra,* 156 Cal.App.4th at pp. 1283-1287), or drafters' error (see *Shields, supra,* 155 Cal.App.4th at p. 564; *Carroll, supra,* 158 Cal.App.4th at p. 510).

[7]  Section 6601 was amended in 2008 in ways that do not affect our analysis. (See, Stats. 2008, ch. 601 (Senate Bill No. 1546).)

[*]  See footnote, *ante,* page 1.

[8]  Felix acknowledges that the ex post facto clause does not apply because the SVPA is a nonpunitive civil law. (See *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1179.)

12

*event necessary to trigger application of the statute* occurred before or after the statute's effective date. [Citations.] A law is not retroactive "merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment." [Citation.]' ([Citation], italics added.)" (*Carroll, supra*, 158 Cal.App.4th at p. 513.)

We agree with all published decisions addressing the issue that applying the 2006 amendments to petitions for extensions of commitments that go to trial after the effective date of the amendments is not a retroactive application of the law. (*Carroll, supra,* 158 Cal.App.4th at pp. 512-514; *Bourquez, supra,* 156 Cal.App.4th at p. 1289; *Whaley, supra,* 160 Cal.App.4th at p. 799.) The issue at the trial on an extension petition is whether the person is an SVP *at the time of commitment.* (*Carroll*, at pp. 513-514.) Each SVP trial is a new and independent proceeding. (*Bourquez*, at p. 1289.) Applying current law to a determination of the respondent's current status is not a retroactive application.

Felix argues his case is distinguishable because at the time of the October 2006 trial, the terms of commitment sought in the original 2002 and 2004 petitions had expired (on July 22, 2006). Delays of the sort experienced by Felix were not uncommon under the former SVPA. (See *Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156, 1170.) In *Orozco v. Superior Court*, the court of appeal held that the trial court did not lose jurisdiction over an extension petition even though the term of commitment sought by the petition expired before a trial could be held on the petition, and held that the delay did not violate the respondent's due process rights where it was attributable to the respondent or his attorney. (*Orozco v. Superior Court* (2004) 117 Cal.App.4th 170, 179-180.) "Given the absence of statutory time limits, the Courts of Appeal have implied that the only act that could divest the court of subject matter jurisdiction and trigger a dismissal is the People's failure to file a petition for recommitment before the prior commitment expires." (*Litmon*, at p. 1171.) Felix does not argue that the delay in the proceedings violated his due process rights. Because the court had jurisdiction over the petitions,

13

even though the terms of commitment sought in the petitions had expired, the court had the power to allow the People to amend the petitions to apply current law. For the reasons explained above, the application of that law was not retroactive. Therefore, Felix's challenge to the amendment fails.

III. *Estoppel by Consent Judgment in Mayberg*[9] *

In *Mayberg*, the United States Department of Justice sued the State of California, DMH Director Stephen Mayberg (in his official capacity only), and other state officials "to remedy an alleged pattern or practice of conduct that was alleged to deprive patients of Metropolitan State Hospital, in Norwalk, California, and Napa State Hospital, in Napa, California [State Hospitals] of rights, privileges, and immunities secured or protected by the Constitution or laws of the United States." (*Mayberg, supra,* (C.D. Cal.) CV-06-2667-GPS.) On the same day the complaint was filed, the parties stipulated to a consent judgment requiring the defendants to take measures to improve conditions in the State Hospitals. The court signed the judgment on May 15, 2006. On August 2, 2006, the complaint and consent judgment were amended to encompass Atascadero State Hospital in addition to the other named hospitals.[10]

The thrust of the consent judgment is to require defendants to use a "Recovery philosophy of care and a Psychiatric Rehabilitation model of service delivery" designed to strengthen and support each individual's recovery and rehabilitation. To that end, "Therapeutic and rehabilitation services shall be designed to address each individual's

---

[9] Although Felix raised this argument in the trial court only with respect to the 2006 petition, which was ultimately dismissed, the parties briefed the issue on the merits as if it were applicable to the consolidated 2002 and 2004 petitions, which resulted in his indeterminate commitment. Therefore, we address the issue on the merits as well.

* See footnote, *ante*, page 1.

[10] Felix's request that we take judicial notice of the federal district court docket sheet for *Mayberg* (*United States v. California*, C.D. Cal., *supra*, No. CV-06-2667-GPS) is granted. (Evid. Code §§ 452, subd. (d), 459, subd. (b).)

14

needs . . . ." The judgment imposes detailed requirements for these individual assessments. In the area of psychiatric assessments and diagnoses, the judgment requires defendants to "use the diagnostic criteria of the most current Diagnostic and Statistical Manual of Mental Disorders [ ] for reaching the most accurate psychiatric diagnoses." The judgment sets forth assessment requirements for the first 24 hours and first seven days of the patient's admission to the State Hospital. It then provides, "Each State Hospital shall ensure that: i. clinically justifiable diagnoses are provided for each individual, and all diagnoses that cannot be clinically justified for an individual are discontinued no later than the next review; ii. the documented justification of the diagnoses is in accord with the criteria contained in the most current DSM (as per DSM-IV-TR Checklist); iii. differential diagnoses, 'deferred,' or 'rule-out' diagnoses, and diagnoses listed as 'NOS' ('Not Otherwise Specified') are timely addressed (i.e., within 60 days), through clinically appropriate assessments, and resolved in a clinically justifiable manner; and iv. 'no diagnosis' is clinically justified and documented."

Felix argues the People are judicially estopped from proceeding on the commitment petitions filed against him because the consent judgment precludes the type of diagnosis rendered in his case. He argues "the State of California seeks to continue to detain the defendant indefinitely based on a diagnostic theory which the State has recently and specifically repudiated in a voluntary agreement in a federal court."

Judicial estoppel applies when a party is successful in asserting a position in a judicial proceeding: the party will be estopped from taking a completely inconsistent position in a subsequent judicial proceeding. (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422.) Felix has not shown that the defendants in the *Mayberg* action successfully *asserted* the position that NOS diagnoses should be timely addressed and resolved in a clinically justifiable manner. Rather, the defendants acquiesced in a consent judgment that imposed this requirement on the State Hospitals.

15

Nor are the People estopped under the doctrine of collateral estoppel. "The doctrine of collateral estoppel precludes relitigation of an issue previously adjudicated if: (1) the issue necessarily decided in the previous suit is identical to the issue sought to be relitigated; (2) there was a final judgment on the merits of the previous suit; and (3) the party against whom the plea is asserted was a party, or in privity with a party, to the previous suit. [Citation.]" (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 910 (*Producers Dairy*).) A stipulated judgment may properly be given collateral estoppel effect if the parties manifest an intent to be collaterally bound by the judgment, as by stipulating to a specific factual finding. (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664-665 & fn. 2.) Felix argues the consent judgment "implicitly recognized what the introduction to the DSM IV makes clear: 'NOS' diagnoses are inherently limited and imprecise. Although useful as an initial diagnoses [*sic*] pending further investigation, a persistent NOS label as a primary diagnosis may well be a sign that the patient, despite some symptoms of mental disease, may not actually suffer form [*sic*] any identifiable and treatable disease." Neither the DSM IV nor the consent judgment supports this argument.

The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR) explains: "Because of the diversity of clinical presentations, it is impossible for the diagnostic nomenclature to cover every possible situation. For this reason, each diagnostic class has at least one Not Otherwise Specified (NOS) category .... *There are four situations in which an NOS diagnosis may be appropriate*." (DSM-IV-TR (2000) at p. 4, italics added.) First, "[t]he presentation *conforms to the general guidelines for a mental disorder* in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders. This would occur either when the symptoms are below the diagnostic threshold for one of the specific disorders or when there is an atypical or mixed presentation." (*Ibid.*, italics added.) Second, an NOS diagnosis may be appropriate if the presentation "conforms to a symptom pattern that has

16

not been included in the DSM-IV Classification but that causes clinically significant distress or impairment." (*Ibid.*) Third, an NOS diagnosis may be appropriate if there is "uncertainty about etiology (i.e., whether the disorder is due to a general medical condition, is substance induced, or is primary)." Fourth, an NOS diagnosis may be appropriate "[i]f there is insufficient opportunity for complete data collection . . . or inconsistent or contradictory information, but there is enough information to place it within a particular diagnostic class." (*Ibid.*) In other words, the DSM lists particular instances when an NOS diagnosis is clinically appropriate in the mental health setting, like the SVP determination.

Felix cites isolated language in these four categories to argue an NOS diagnosis is a "fallback" diagnosis that is "neither complete nor effective," but is "by its nature, tentative or imprecise." As to the first category, Felix emphasizes the language that the symptoms may be "below the diagnostic threshold for one of the specific disorders," but he ignores the language requiring the presentation conform to the general guidelines for mental disorder or providing that an NOS diagnosis might be based on an atypical or mixed presentation rather than on symptoms being below a diagnostic threshold. As to the second category, he emphasizes the language that the symptom pattern has not been included in the DSM, but ignores the language that the pattern "causes clinically significant distress or impairment." As to the third category, he emphasizes the language regarding uncertain etiology, but ignores the fact that the category is not based on uncertainty about the patient's symptoms. As to the fourth category, he emphasizes the language about insufficient information, but ignores the requirement of sufficient information to place it within a particular diagnostic class. Indeed, as to all categories, Felix ignores the fact that the DSM-IV-TR provides such diagnoses "may be appropriate" if they satisfy the listed criteria. Felix's lay opinion that such diagnoses are "incomplete and only preliminary to a true, 'clinically justifiable' diagnosis" is contradicted by the DSM itself.

17

Felix also misrepresents the substance of the consent judgment. The judgment makes no express assertion (or finding) that NOS diagnoses are incomplete and unreliable. Nor does the consent judgment implicitly recognize such an assertion. The judgment requires NOS diagnoses to be addressed and resolved in a "clinically justifiable manner." Nothing precludes a further NOS diagnosis as a "clinically justifiable" resolution of the original diagnosis. The DSM-IV-TR acknowledges that NOS diagnoses may be appropriate. Some of the circumstances in which such a diagnosis is appropriate are based on limited information that might be augmented upon a further diagnosis: for example, newly discovered information about the patient's history that place him or her within a specific classification, symptoms observed at the State Hospital that bring the patient within the diagnostic threshold of a specific classification, or newly discovered information about the etiology of the patient's symptoms. The language relied on by Felix in the consent judgment follows a list of requirements for prompt diagnosis of newly admitted patients. Therefore, the language could be directed primarily at preliminary NOS diagnoses that are based on available information. Nothing in the judgment, however, indicates that an ongoing NOS diagnosis would not be appropriate based on all the information the State Hospital is able to gather about the patient.

It is also significant to this court that the particular DSM diagnosis of "paraphilia NOS" has been the Axis 1 diagnosis in at least two important decisions discussing the legal appropriateness of an SVP finding under the SVPA. In *Hubbart v. Superior Court, supra,* 19 Cal.4th 1138, the mental health disorder determined by the two mental health professionals (Drs. Nelson and Phenix) associated with the People's case was "paraphilia not otherwise specified." (*Id.* at 1150.) In *People v. Williams* (2003) 31 Cal.4th 757 (*Williams*), the same particular mental health Axis 1 diagnosis was reached by the two licensed psychologists for the prosecution (Drs. Sheppard and Franks). (*Id.* at pp. 761-762.) Indeed, Dr. Sheppard concluded that a feature of this condition "predispose[d] [Williams] to sexually violent criminal behavior, as evidenced by his repeated

18

misconduct of this nature and the fact that 'even in a controlled setting [he] continues to sexually act out in about the only way he can.' " (*Id.* at p. 762.) The Supreme Court then noted in *Williams* that the testimony regarding this particular disorder is "ample evidence" of the requisite proof of a serious difficulty in controlling dangerous behavior for purposes of the SVPA. "Both expert witnesses testified that defendant suffers from paraphilia, a serious, incurable mental disorder, which is characterized by the obsessive, repetitive, and driven nature of his criminal sexual violence." (*Id.* at p. 778.)

Finally, even if an NOS diagnosis were insufficient for implementation of the individualized recovery and rehabilitation treatment plans required by the consent judgment, it does not follow that they are insufficient for proof that a respondent is a sexually violent predator. The Legislature and voters have acknowledged that sexually violent predators are a small set of extremely dangerous offenders that are very difficult or impossible to successfully treat. The People relied not only on the psychiatric diagnoses of Felix to prove he was an SVP, but also on his commission of sexually violent predatory crimes and specific psychiatric or psychological observations and assessments of his mental disorder, and dangerousness. The consent judgment in no way compels the People to provide a non-NOS psychiatric diagnosis before it can establish that a respondent is an SVP.

IV.  *Proof of Recent Overt Act[11]*

Felix argues proof of his SVP status was insufficient because there was no evidence he committed a recent overt act while he was out of custody.

Section 6600, subdivision (d) provides, " 'Danger to the health and safety of others' does not require proof of a recent overt act while the offender is in custody."

---

[11]  Although Felix raised this argument in the trial court only with respect to the 2006 petition, which was ultimately dismissed, the parties briefed the issue on the merits as if it were applicable to the consolidated 2002 and 2004 petitions, which resulted in his indeterminate commitment. Therefore, we address the issue on the merits as well.

19

(§ 6600, subd. (d); Stats. 2006, ch. 337, § 53; see also Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006) § 24.) Former section 6600, subdivision (d) was identical. (Former § 6600, subd. (d); Stats. 1995, ch. 763, § 3, p. 5923.) The statute authorizes commitment if a court or jury determines beyond a reasonable doubt that the person is an SVP. (§ 6604; Stats. 2006, ch. 337, § 55; see also Prop. 83 as approved by voters, Gen. Elec. (Nov. 7, 2006) § 27.) An SVP is defined as "a person who has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person *a danger to the health and safety of others* in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1), italics added; Stats. 2006, ch. 337, § 53; see also Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006) § 24.)

Felix argues the People were required to prove in this instant case that he committed an overt act while he was released on parole in the mid-1990s. We disagree. The issue before the jury was Felix's status as an SVP at the time of trial. The lack of a "recent" overt act was immaterial because recently (i.e., since 1996) Felix had been in custody. Section 6600, subdivision (d) expressly provided that recent overt acts need not be proven "while the offender is in custody." During the time of the trial we review here, and for approximately ten years before, Felix was "in custody" for purposes of the SVPA. Nor does due process require proof of a recent overt act in such circumstances. "Due process does not require that the absurd be done before a compelling state interest can be vindicated. As in the present case, [a mentally disturbed sex offender] may have a predisposition to commit a specific type of sexual offense—one that cannot, as a practical matter, be committed during confinement." (*People v. Martin* (1980) 107 Cal.App.3d 714, 725.)

Felix contends section 6600, subdivision (d) impliedly requires proof of a "recent overt act" whenever a person named in an SVP petition "has been out of custody for an extended period of time." However, he does not try to reconcile this "recent overt act"

20

Case5:10-cv-02823-LHK   Document1-5   Filed06/28/10   Page22 of 28

requirement with the facts in this particular case, where ten years have elapsed since he was last out of custody, and commitment and recommitment determinations have passed without any challenge, becoming final judgments. Insofar as Felix argues that the facts of this case require the People to address the issue of any recent conduct by Petitioner to satisfy due process concerns, we disagree.

He relies on two cases for his argument. The first is *In re Young* (1993) 122 Wn.2d 1 [857 P.2d 989]. In that case, the petitioner Cunningham had "been released from confinement on a sex offense. . . and lives in the community immediately prior to the initiation of sex predator proceedings. . . proof of a recent overt act is necessary to satisfy due process concerns. . . ." (*Id.* at p. 41 [857 P.2d 1009].) *Young* relied on a 1982 Washington Supreme Court decision, *In re Harris*, which held that recent overt acts had to be proven before an individual could be civilly committed under a statute similar to California's Lanterman-Petris-Short Act, Welfare and Institutions Code section 5000 et seq. (*In re Young,* at p. 41, citing *In re Harris* (1982) 98 Wn.2d 276, 284 [654 P.2d 109, 113].) *Harris* relied in part on the particular language of the Washington statute and in part on two federal opinions that held a recent overt act finding was a due process requirement. (*In re Harris, supra,* at pp. 284-285 [654 P.2d at p. 113].) Significantly, since *Harris,* a number of courts have held the due process clause does not require proof of a recent overt act to establish dangerousness sufficient to warrant a civil commitment. See *Project Release v. Prevost* (2d.Cir. 1983) 722 F.2d 960, 973-974 [listing cases and rejecting the particular requirement]; *Fisk v. Letterman* (S.D.N.Y. 2007) 501 F.Supp.2d 505, 523-524 [proof of overt act not required]; *In re Commitment of Bush* (2005) 283 Wis.2d 90, 95-96 [699 N.W.2d 80, 83], *cert. denied,* 546 U.S. 1004 [rejecting argument that due process requires proof of recent overt act to support SVP determination where there is a break in SVP's incarceration and SVP was recommitted for nonsexual behavior]; *In re Commitment of P.Z.H.* (2005) 377 N.J.Super. 458, 466 [873 A.2d 595, 600] [current incarceration for SVP qualifying offense not required; commitment

21

constitutional regardless of the date of last predicate offense, where the statutory requirements otherwise met]; *Beasley v. Molett* (Tex.App. 2002) 95 S.W.3d 590, 599 [Texas's SVP Act not unconstitutional for failure to require proof of recent overt act, where the statute required proof of repeat sexual offenses and a behavior abnormality making the SVP a "menace to the health and safety of another person"]; and *In the Matter of Maricopa County Cause No. MH-90-00566* (1992) 173 Ariz. 177, 184 [proof of recent overt act not required for civil commitment, where statute required proof by clear and convincing evidence of substantial probability of harm]. This authority is substantial; it supports this court's determination that there is no due process violation with the manner of applying the SVPA to this case.

It is also significant that the courts of Washington have moved away from the degree of reliance petitioner places on the *Young* holding. Simply stated, the SVP statute in Washington does not require proof of a recent overt act when the individual is in "custody." If the person named in the petition was confined or in custody at the time of the petition being filed, and therefore not "living in the community" the "recent overt act" requirement under the statute does not apply. (*In the Detention of Lewis* (2008) 163 Wn.2d 188, 201 [177 P.3d 708, 715].). The rationale of *Young* is therefore limited to its factual predicate. It would not apply in this case where Felix has been in custody for approximately ten years before the trial which is the subject of this appeal.

The other case cited by Felix is *In re Detention of Gonzales* (Ia. 2003) 658 N.W.2d 102. There, the statute in question, when applied to the facts in the case, expressly obligated the trial court to find that the person had committed a recent overt act. Gonzales was not confined at the time the petition was filed. The Iowa statute expressly stated that a proper finding of " '[l]ikely to engage in predatory acts of sexual violence,' " for a non-confined subject, could be found "only if the person commits a recent overt act." (*Id.* at p. 103.) Obviously, the circumstances in this case diffuse reliance on this case interpreting specific provisions of an Iowa statute.

22

The United States and California Supreme Courts have exhaustively examined the issue of what showing is required to confine a sexually violent predator against his or her will consistent with the due process clause. (See, e.g., *Kansas v. Crane* (2002) 534 U.S. 407; *Williams, supra,* 31 Cal.4th 757.) These controlling decisions require a finding of dangerousness to one's self or others that is linked to a mental disorder causing serious difficulty in controlling one's behavior. (*Williams,* at pp. 771-772, discussing *Kansas v. Crane, supra,* 534 U.S. 407.) The decisions do not require proof of recent overt acts as a constitutional minimum for these types of civil commitments. The requirements of two convictions for sexually violent offenses and evidence of a current mental disorder making it likely the individual will reoffend satisfy the due process dangerousness requirement in this context. (*Williams,* at pp. 764, 776.)

Even if the state is required to prove an overt act during Felix's most recent sustained period out of custody, the requirement was satisfied here. During that period (the mid-1990s), Felix was repeatedly returned to custody for parole violations. Dr. Scherrer testified at the 2006 trial that the length of time Felix was out of custody was insufficient to conclude he was not a significant risk of committing further sexually violent offenses. Combined with his prior convictions for sexually violent offenses involving more than two separate victims and the current psychiatric opinion that he had a mental disorder that caused him serious difficulty in controlling his behavior, the totality of this evidence demonstrated sufficient dangerousness to involuntarily commit Felix as an SVP.

## V.    *Evaluation by Independent Psychologists*[*]

The SVPA requires that the DMH evaluation of persons to determine whether they are SVPs be conducted by two practicing psychiatrists or psychologists. (§ 6601, subds. (c) & (d); Stats. 2006, ch. 337, § 54.) If the two evaluators concur, the DMH must

---

[*]    See footnote, *ante,* page 1.

23

request that the appropriate county file a petition for commitment. (§ 6601, subd. (h); Stats. 2006, ch. 337, § 54.) If they do not concur, DMH must "arrange for further examination of the person by two independent professionals selected in accordance with subdivision (g)." (§ 6601, subd. (e); Stats. 2006, ch. 337, § 54.) If the two independent professionals agree the person meets the criteria for commitment, a petition for commitment may be filed. (§ 6601, subd. (f); Stats. 2006, ch. 337, § 54.)

Section 6601, subdivision (g) provides, "Any independent professional who is designated by the Secretary of the Department of Corrections and Rehabilitation or the Department of Mental Health for purposes of this section shall not be a state government employee . . . . The requirements set forth in this section also shall apply to any professionals appointed by the court to evaluate the person for purposes of any other proceedings under this article." (§ 6601, subd. (g); Stats. 2006, ch. 337, § 54.)

Felix argues it was error to allow Dr. Mark Scherrer of Atascadero State Hospital to testify for the People at his probable cause hearing and at trial because Dr. Scherrer was a state government employee. Felix, however, does not show that two practicing psychiatrists or psychologists designated by the DMH to evaluate Felix had disagreed about whether he was an SVP and that the DMH designated Dr. Scherrer as an independent professional to evaluate Felix pursuant to section 6601, subdivisions (e) and (f). Nor does he show that Dr. Scherrer was "appointed by the court." (§ 6601, subd. (g); Stats. 2006, ch. 337, § 54.) His argument fails.

VI.    *Dismissal of 2006 Petition*[*]

Felix argues the trial court should not have dismissed the petition to extend his commitment from 2006 forward. We disagree. That petition became moot when the court ordered Felix committed to an indeterminate term in October 2006. (Cf. *People v. Hayes* (2006) 137 Cal.App.4th 34, 51-52 [invalidity of trial on an extension petition

---

[*]    See footnote, *ante*, page 1.

24

harmless error because simultaneous valid trial on prior petition for an extension term that had all but expired presented essentially the same issue: whether the respondent was an SVP at the time of trial].)

DISPOSITION

The indeterminate term of commitment imposed October 20, 2006 and the dismissal of the 2006 petition are affirmed.

DONDERO, J. *

We concur:

SIMONS, ACTING P. J.

NEEDHAM, J.

\* Judge of the Superior Court of San Francisco City and County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Felix* A115717

26

Trial Court                                    City & County of San Francisco Superior Court


Trial Judge                                    Honorable Mary Morgan


For Plaintiff and Appellant                    Mazur & Mazur
                                               Janice R. Mazur, Esq.
                                               William E. Mazur, Jr.


For Respondent                                 Edmund G. Brown Jr.,
                                               Attorney General

                                               Dane R. Gillette,
                                               Chief Assistant Attorney General

                                               Gerald A. Engler,
                                               Senior Asisstant Attorney General

                                               Laurence K. Sullivan,
                                               Supervising Deputy Attorney General

                                               Moona Nandi,
                                               Deputy Attorney General


*People v. Felix,* A115717